### HARTFORD, WINDHAM, LITCHFIELD, MIDDLESEX AND TOLLAND.

HELD ON THE FIRST TUESDAY OF JANUARY, 1881.

[Continued from the last volume.]

---

Present

PARK, C. J., CARPENTER, PARDEE, LOOMIS AND
GRANGER, Js.

---

FRANCES C. BLODGETT AND OTHERS *vs.* THE AMERICAN
NATIONAL BANK AND OTHERS.

A copartnership of which *B* had for several years been the senior member
and his son and son-in-law the other members, was reorganized for the
prosecution of the same business under partnership articles in which it
was provided that the partnership should not be dissolved by the death
of *B*, but that his executor should act in his stead in the performance
of his stipulations; that each partner should be credited by the new firm
with the amount of capital he had already put in, with interest at seven
per cent. in *B's* favor and at six per cent. in favor of the others;
that the profits should be taken by the other partners, and that as fast
as capital could be spared it should be used to reduce by payments
the amount *B* had in the concern. *B* died soon after, leaving a will in
which he disposed of his property, but in which he made no further
provision with regard to the partnership. The remaining members of
the firm, one of whom was his executor, continued the business as
before, and the firm finally failed. Held—
1. That *B's* estate was liable for debts of the partnership contracted after
his death.
2. That this liability was not limited to the amount that he had put into
the partnership, but extended to his whole estate.

VOL. XLIX.—2.

3. That *B's* executor had power, while the firm was carrying on its business, to pledge the assets of the estate for the purpose of raising necessary funds for the use of the firm.

BILL IN EQUITY by the beneficiaries under a testamentary trust, to compel the redelivery to the trustee of certain stock claimed to have been improperly pledged to the respondent bank, and for an accounting for stock sold; brought to the Superior Court in Hartford County.   The following facts were found by a committee :

Roswell Blodgett, of the city of Hartford, died January 19th, 1875, testate, and leaving an estate amounting to $281,026, as inventoried in the probate court.   His will, which was duly proved, contained the following provisions:

" *Second.* I direct that my estate, both real and personal shall be divided into six equal parts.

" *Third.* I hereby give, devise and bequeath to my son Roswell F. Blodgett one of said parts, to be his and his heirs' forever.

" *Fourth.* The remaining five parts, or five-sixths of my whole estate, I hereby give, devise and bequeath to my said son Roswell F. Blodgett, and to his heirs, in trust for the following purposes, to wit:   1st. To pay the annual income and profits of two-sixths of the whole estate to my wife Frances C. Blodgett during the full term of her natural life, to be by her received in lieu of dower.   2d, To pay the annual income and profits of one-sixth of my estate to my daughter Anna E. Blodgett during her natural life.   3d, To pay the annual income and profits of one-sixth of my estate to my daughter Jane F. Cowles, wife of George A. Cowles of Philadelphia, during her natural life.   4th, To pay the annual income and profits of one-sixth of my estate to my daughter Leila F. B. Clapp, wife of John B. Clapp of said Hartford, during her natural life.

" *Eighth.* After the decease of my daughter Leila F. B. Clapp, I direct said trustee to transfer and deliver to her legal issue, if any she shall leave surviving her, the one sixth part of my estate, the income of which she had during her life, to be theirs and their heirs' forever."

Frances C. Blodgett is the widow, and Anna E. Blodgett, Leila F. B. Clapp and Jane F. Cowles are the children, and John Roswell Clapp is the only grandchild of the deceased. John Roswell Clapp is a minor.

Rowland Swift, president of the respondent bank, named as one of the executors in the will, declined to act. Roswell F. Blodgett, one of the respondents, son of the testator, named as the other executor in the will, accepted the trust, gave bonds, and has acted as sole executor in the settlement of the estate. On April 1st, 1876, by order of the probate court, a distribution was made of the estate according to the terms of the will, which was duly accepted by the court. The terms of the distribution have been known to the several distributees since the same was so made and accepted. Since the distribution Roswell F. Blodgett has had the sole charge and control of the estate as trustee for the several distributees, according to the provisions of the will. None of the shares of stock distributed have been transferred into the names of the several distributees, or into the name of Roswell F. Blodgett as trustee.

From 1863 to January 16th, 1875, Roswell Blodgett was a member of the firm of R. F. Blodgett & Co., a copartnership doing business in Hartford as dealers in iron and steel. Roswell Blodgett and Roswell F. Blodgett comprised the firm until 1867, when the said John B. Clapp became a member thereof, and from that time until January 16th, 1875, the firm consisted of the two Blodgetts and Clapp.

On the 16th of January, 1875, Roswell Blodgett, Roswell F. Blodgett and John B. Clapp made a new copartnership agreement in writing, of which the following were the principal provisions:

" That said parties, for the purpose of carrying on the iron and steel business as now carried on in said Hartford by the firm of R. F. Blodgett & Co., have agreed to unite their money and services upon the following terms, agreements and conditions, to the performance of which they mutually bind themselves, each to the other, his

executors and administrators; and said Roswell Blodgett hereby agrees and provides that his death shall not dissolve the partnership hereby formed, but his executor or executors or other legal representatives, without giving special bond, shall act in his stead in the performance of all the stipulations herein contained.

"That the firm name of said partnership shall be R. F. Blodgett & Co., from the date of this instrument to April 1st., 1875, and from and after said April 1st shall be Blodgett & Clapp, and shall continue from the date of this agreement to March 31st, 1878.

"That the firm hereby constituted shall succeed to and be possessed of all the property of every kind and description belonging to the firm of R. F. Blodgett & Co., as heretofore existing, and the interest of each party hereto in said last mentioned firm, as appears by its books, shall be a part of the capital of this firm, and shall be credited to each member upon the books of the new firm as capital stock furnished by him, upon which interest shall be allowed as hereinafter provided; that said Roswell Blodgett shall furnish for the use of this firm the store and lot now occupied by R. F. Blodgett & Co., on Market street; and that to supply the needed additional capital said Roswell Blodgett shall furnish in cash, within six months from the date of this instrument, twenty-five hundred dollars; that said Roswell F. Blodgett shall furnish in cash twenty-five hundred dollars; and that said Clapp shall sell, at the earliest practicable time, all real estate owned by him not situated in proximity to said Market street store and lot, together with at least three fourths of all his stock in the Hartford Axle Company and Hartford Foundry & Machine Company, and all of his driving horses except one, and put the entire proceeds of all said sales into the business of said partnership.

"That interest at the rate of seven per cent. per annum shall be allowed to Roswell Blodgett, on the cost of said store and lot, the same being about thirty thousand dollars, and on the amount of capital furnished by him, which inter-

est shall be credited to him on the books of the firm during the first year only and thereafter shall be paid semi-annually in cash.

"That interest at the rate of six per cent. per annum shall be allowed to Roswell F. Blodgett and John B. Clapp on the capital furnished by them, which shall be credited to them on the books of the firm; and that threefourths of the profits of said business shall belong to said Clapp and one-fourth to said Roswell F. Blodgett; and all losses shall be borne by them in the same proportion.

"That if any capital can be spared from the business of the firm the same shall be paid to Roswell Blodgett or his legal representative in reduction of the amount of capital furnished by him.

"That in case of the death of said Roswell Blodgett, the consent of his executor or other legal representative shall be obtained, whenever by the terms of this agreement the consent of said Roswell Blodgett if living would be required."

After April 1st, 1875, the copartnership formed by this agreement did business under the firm name of Blodgett & Clapp. The copartnership formed under the agreement of January 16th, 1875, carried on the same business as the original firm of R. F. Blodgett & Co., taking all its assets and assuming all its liabilities. The amount of Roswell Blodgett's capital stock in the firm of R. F. Blodgett & Co. at the time of his death was inventoried at $38,423. The firm of R. F. Blodgett & Co. from 1863 to the death of Roswell Blodgett had dealings with and an account in the respondent bank, and the bank from time to time discounted and renewed the business accommodation paper of the firm. On the 9th day of January, 1875, the bank held under discount business paper of R. F. Blodgett & Co. to the amount of $8,900, and accommodation paper to the amount of $37,800, and held substantially the same amounts on the 16th of January, 1875, and the firm was then an indorser of the paper of the Woodruff Iron Works, in the sum of $40,000. While he lived, the credit of the firm

with the bank depended chiefly on Roswell Blodgett, who had brought the account of the firm to the bank, and was a man of large means.

After the death of Roswell Blodgett the firm continued to do business with the bank without interruption, and kept an account at, and had both business and accommodation paper discounted by the bank, the amount of which gradually increased, till on the 10th of October, 1876, it amounted to about $92,000. The business paper of the firm so discounted consisted of customers' notes endorsed by the firm, and the accommodation paper consisted of notes of the firm alone.

About October 10th, 1876, the bank, by Rowland Swift, its president, required of the firm some additional security for its indebtedness as a condition of further loans by way of discounts, and Roswell F. Blodgett in behalf of the firm agreed to give such security. Thereupon, on the 10th of October, 1876, Roswell F. Blodgett made and delivered to the bank the three notes for $33,500, $29,500, and $10,000 respectively, set forth in the bill. At the same time he delivered to the bank as security for the payment of the note of $33,500, certificates of three hundred and thirty-four shares of the stock of the Adams Express Company; to secure the note for $29,500, certificates of one hundred and forty shares of the stock of the Ætna Insurance Company; and to secure the note for $10,000, certificates of one hundred and twenty shares of the stock of The Pratt & Whitney Company; he also gave in each case his power of attorney for the transfer of the stock.

Of the shares of the Ætna Insurance Company stock so pledged, forty-four shares were subsequently sold by the bank on the order of Roswell F. Blodgett, and the avails applied to retire a part of the indebtedness of the firm to the bank. Of the shares thus sold, twenty-four were set to said Roswell F. in the distribution, and twenty shares to him as trustee for Mrs. Frances C. Blodgett.

All the stocks so pledged to secure these three notes belonged to the estate of Roswell Blodgett, and were

included in the distribution of his estate, and all now remaining unsold in the hands of the bank were, up to October 10th, 1876, held by Roswell F. Blodgett as trustee for his widow and daughters, according to the terms of the will.

The three notes were executed and the stocks pledged as collateral security for any paper of the firm of Blodgett & Clapp then held under discount by the bank, and any other paper of the firm which the bank might afterwards hold under discount while the firm did business with the bank. The agreement that the notes should be given, and the stocks pledged, was made by parol between Rowland Swift acting for the bank, and Roswell F. Blodgett acting for the firm.

None of the paper of the firm held by the bank October 10th, 1876, was then given up. As this paper matured some was renewed and some paid, but none now remains in the bank. Some, however, of the indebtedness due from the firm to the bank on October 10th, 1876, still remains unpaid, and is represented by renewal notes. The amount of this indebtedness is not ascertained.

Rowland Swift has been connected with the bank as an officer from a date prior to 1863. He was well acquainted with Roswell Boldgett in his lifetime, and familiar with the business and condition of the firms of R. F. Blodgett & Co., and Blodgett & Clapp, and on the 10th of October, 1876, and before that time, well knew of the provisions of the will and articles of copartnership, and that the stocks so pledged belonged to the estate of Roswell Blodgett, and that all of them (except the twenty-four shares of Ætna Insurance Company stock set to Roswell F. Blodgett) were then held by the latter as trustee under the will for the benefit of the widow and daughters of the deceased.

In all its dealings with the firm since January 19th, 1875, the bank acted in good faith, upon the belief that the whole estate of Roswell Blodgett was holden for the debts of the firm by virtue of the copartnership agreement of January 16th, 1875.

About April 1st, 1875, Roswell F. Blodgett and John B. Clapp caused to be published in the three daily papers in the city of Hartford the following advertisement:

"NOTICE. The general partnership heretofore existing under the name of R. F. Blodgett & Co. will be continued from this date under the name of Blodgett & Clapp. Hartford, April 1, 1875.

ESTATE OF R. BLODGETT,
by R. F. BLODGETT, Ex'r.,
ROSWELL F. BLODGETT,
JOHN B. CLAPP."

This advertisement was seen at the time of its publication by Frances C. Blodgett the widow. She and the daughters of the deceased knew the provisions of the will and the copartnership agreement in January, 1875.

After the death of Roswell Blodgett the firm went on doing business till about March 31st, 1878, when it became insolvent. During all this time Roswell F. Blodgett regarded and treated the entire estate of the deceased as liable for the debts of the firm.

From January, 1877, accounts were kept on the books of the firm with Roswell F. Blodgett as trustee for each of the other legatees and a private account with each of them, and another account with him as trustee of the estate of Roswell Blodgett.

Roswell F. retained, and applied to the uses of the firm until it became insolvent, the larger part of the income of each of the petitioning legatees from the property distributed to her, which income so withheld was credited to her in her account on the books of the firm, with interest, as was also interest on her portion of the capital stock distributed to her, and also her proportional share, with interest, of the proceeds of stock sold by Roswell F. for the benefit of the firm.

No one of the petitioning legatees knew, until about May 1st, 1878, that the three notes had been executed and stocks pledged by Roswell F. as before stated, nor that her

income so retained had been applied to the use of the firm, nor that the accounts had been kept and stocks sold as stated, except Mrs. Jane F. B. Cowles, who learned some time in 1877 that a part of her income had been so applied by the trustee, and she then objected to this application of her income. Being informed by the trustee that he did not know as he could withdraw the part of her income so applied, she consented to let it remain, but told him to put no more of it into the business of the firm. Mrs. Frances C. Blodgett and Anna E. Blodgett consented that Roswell F. might retain so much of their respective incomes as was so withheld by him for his own benefit and necessities. No one of the petitioners has made any attempt to withdraw from the business of Blodgett & Clapp the amount of capital in business distributed to her.

The value of the stock so pledged now held by the bank is $69,584. The amount of dividends on these stocks collected by the bank is $11,183.04. The amount due the bank on the paper of Blodgett & Clapp is about $41,000.

On the 27th of May, 1878, the petitioners gave the bank notice in writing of the interest of the children of Roswell Blodgett, and of his widow in the stocks delivered to it by the trustee, and that such delivery was without their knowledge or consent, and forbade the bank to dispose of the stock or the income of it in any manner, except by delivering it and the income of it to R. F. Blodgett as trustee.

Upon these facts the case was reserved for the advice of this court.

*R. D. Hubbard* and *F. Chamberlin*, for the petitioners.

The respondent claims that the alleged transfers to it of trust property, though *primâ facie* unlawful, are justified by certain provisions of the copartnership contract. The provisions relied upon, although unusual, have, to some extent, been discussed by text-writers, and passed upon by courts of last resort. Parsons on Part., 406, 439; *M'Neillie* v. *Acton*, 4 De G., M. & G., 755; *Pitkin* v. *Pitkin*, 7 Conn.,

307; *Burwell* v. *Mandeville*, 2 How., 579.   The law of these cases has been recently carefully reviewed and confirmed by the United States Supreme Court in *Smith* v. *Ayer*, 11 Otto, 320.   By these authorities the principles are fully established that any such liability of an estate as is here claimed cannot be presumed, but must exist, if at all, by virtue of express agreement; and that an express agreement will not raise such a liability except when, by the use of " the most clear and unambiguous language," it demonstrates " in the most positive manner the intention of the testator to make his general assets liable for all debts contracted in the continued trade after his death."   Tested by these rules this copartnership contract falls far short of justifying such construction as is claimed by the respondent; for the claim is not, and cannot be, based upon any language expressly creating such liability, but the court is asked to infer it from the provision that Roswell Blodgett's death " shall not dissolve the partnership; " and the language of the partnership contract does not intimate in any manner,— much less " demonstrate in the most positive manner by the use of clear and unambiguous terms,"—an intention on the part of Roswell Blodgett to make his general estate liable for firm debts contracted after his death.   In *Ex parte Richardson*, 3 Madd. Ch., 138, we have a case which runs *quatuor pedibus* with the case at bar.   The decision of the vice-chancellor, Sir John Leach, was as follows : — " A trustee under a will carrying on a trade pledges the trust property given to him for that purpose, and also his own property; but what is the trust property given to him for that purpose must depend úpon the terms of the will.   In this case all there was meant to be left to carry on the trade was the capital in the trade, and the executrix was not authorized to employ one shilling of the assets beyond the capital in the trade.   What the executrix has employed beyond the capital was in breach of her trust."   This decision is one of those referred to with approval in *Smith* v. *Ayer*, 11 Otto, 330, and by reason of its very close analogy would seem to be decisive of the case at bar.   In respect of

the provisions of this co-partnership agreement, we there-
fore submit, that their effect is not to make the *entire* estate
of Roswell Blodgett liable for the debts of the firm incurred
after his decease, but only to make liable therefor such
part of his estate as prior to his death he had invested, or
agreed to invest, in the business of the firm. *Ex parte
Garland*, 10 Ves., 109; and cases before cited. These
articles afford ample proof that Roswell Blodgett did not
intend to bind his general assets for debts of the firm con-
tracted after his death. The following provisions clearly
show that he had no intention·of contributing any addi-
tional capital other than that named in the articles, viz.:—
" To supply the needed additional capital, Roswell Blod-
gett shall furnish in cash within six months, $2,500."
" That interest on cost of store and on capital furnished,
shall be credited to him for one year *only*, and thereafter
paid semi-annually in cash." " That if any capital can be
spared from the business of the firm the same shall be paid
to Roswell Blodgett or his legal representative, in reduction
of the amount of capital furnished by him." " That the
executor shall act in his stead in the performance of all the
stipulations herein contained." And as the agreement
expressly stipulates what the executor should do, but does
not stipulate that he shall provide for the firm a line of
discounts, therefore his acts in that respect were unauthor-
ized. Further, as Roswell Blodgett had no share in the
profits or losses of the firm, it is unreasonable to presume
that he could have intended to make his whole estate liable
for all the debts of the firm incurred after his death.

Were it possible to hold that the entire estate of Roswell
Blodgett would be liable, under the co-partnership agree-
ment, for all debts incurred by the firm after his death, it
would not follow that his executor would be thereby author-
ized to do the acts of which these petitioners complain.
His executor was not an agent clothed with all the powers
of a living Roswell Blodgett, but an agent limited to the
performance of such stipulations only as the partnership
contract imposed upon the testator. And such executor at

best would not have authority to do more than his testator, if living, could have been compelled to do under the co-partnership articles. Besides, there is a wide difference between being liable for all the debts a firm may be able to contract upon its own credit within a given time, and being obliged to supply all the choice securities which a bank may desire, to induce it to extend a large line of discounts for which it would not otherwise give credit.

*J. Halsey* and *L. E. Stanton,* for the respondent.

1. The pledge was made to secure debts which the estate of Roswell Blodgett was bound to pay; he had in his lifetime entered into contract liabilities from which his estate could not escape. The petitioners found their demand upon the *will* and *distribution.* We meet them with the *contract.* Then they say that the will and contract taken together do not subject the estate to these partnership liabilities. But the will and contract are not in *pari materiâ.* Contract liabilities stand in spite of all wills.

2. The petitioners insist that the contract was only an arrangement to retain in the business that capital which Roswell Blodgett had in his lifetime invested in it. But the authorities cited in support of such construction are not applicable to the present case. Those authorities are cases of wills, in which a testator had set apart for a business a particular interest or stock or amount. *Pitkin* v. *Pitkin,* 7 Conn., 307; *Ex parte Garland,* 10 Ves., 110; *Ex parte Richardson,* 3 Madd. Ch., 148; *Thompson* v. *Andrews,* 1 Mylne & K., 116; *Kirkman* v. *Booth,* 11 Beav., 273; *Cutbush* v. *Cutbush,* 1 Beav., 184; *Burwell* v. *Mandeville,* 2 How., 560; *M'Neillie* v. *Acton,* 4 DeG., M. & G., 744. But this is a case not of a will, but of partnership articles. Partnerships may be continued after death by contract. Story on Part., § 319*a; Warner* v. *Cunningham,* 3 Dow. Parl. Ca., 76; *Balmain* v. *Shore,* 9 Ves., 500; *Pearce* v. *Chamberlin,* 2 Ves., 33; *Scholefield* v. *Eichelberger,* 7 Peters, 594; Toller on Exrs., 166; *Gratz* v. *Bayard,* 11 Serg. & R., 41; *Laughlin* v. *Lorenz's Admr.,* 48

Penn. St., 275; *In re Northern Coal Mining Co.*, 16 Jur., 299; *Beveridge* v. *Beveridge*, 2 Pat. Scotch App., 1976; *Powell* v. *Hopson*, 13 La. Ann., 626; *Duffield* v. *Brainerd*, 45 Conn., 424; *Butler* v. *Am. Toy Co.*, 46 id., 145. Parsons, it is true, denies that there can be such continuance after death. He insists that all agreements against dissolution by death, are merely arrangements for a new firm to take the place of the old one. Parsons on Part., 439. The distinction is of little consequence, if the liability of a deceased partner may by contract be extended beyond his death, which all the authorities establish.

3. The plain intent of the agreement was to make the estate a partner, and to hold the general assets bound until the end of the term. It is a question of construction and of the intent of the parties. There is nothing to show that the three signers of the paper for a moment supposed that the contract was only for capital, and not for credit and responsibility also. There is no word which points toward capital alone. These provisions point to three partners, equally and mutually bound, and we say such was plainly the understanding of the signers. It is said that the purpose was to retain certain capital in a trade. But the contract directly declares the purpose to be to carry on "the iron and steel business as now carried on by the firm of R. F. Blodgett & Co." But R. F. Blodgett & Co. was composed of three partners, and its credit depended mainly upon Roswell Blodgett.

4. The construction insisted upon by the petitioners destroys the mutuality of the covenants. This contract, in case Roswell Blodgett died within the term, was to cover two periods of time. One period was his lifetime after the date of the contract. The other period was from the date of his death until March 31st, 1878. If during his lifetime the partners gave consent to the creation of debts, they were all to be bound to the extent of the private property of each. But if this, as to Roswell Blodgett, is a contract for *capital* and not *credit* in case of his death, then after his death the contract is no longer mutual. It has now,

according to our opponents, become a contract where an executor may consent to create debts, but the private estate of only two survivors shall be bound. Again, if during the lifetime of Roswell Blodgett there was a wrongful dissolution within the three years, any partner guilty of the wrong is bound, and is liable to the extent of his general assets, to respond in damages. But if after such death the agreement means capital but not responsibility, as to Roswell Blodgett, strange results would follow. Clapp would be liable in damages to be collected out of his private property for wrongfully withdrawing his capital and his services. Such damages collected of him would go to the benefit of R. F. Blodgett, and of the estate of Roswell Blodgett, and part of them would find their way into the hands of these petitioners. But if R. F. Blodgett, the executor, should wrongfully force a dissolution, then, apart from his personal responsibility, nothing but "capital already embarked" is liable. And that capital is to be liable only for a wrongful withdrawal or attempt to withdraw the same. But the "capital already embarked," might then be involved by debts. An immediate dissolution might be ruin to Clapp, while if the business could go on large profits could be realized. Thus he might be without remedy for a wrongful and unnecessary breaking up of his business. Thus a contract which began as a mutual one has turned out to be a one-sided one. And again, as to the other two partners it is not denied that the contract means capital, services and responsibility as long as they continue to be members. But upon the construction of our opponents the contract as to Roswell Blodgett means capital and responsibility so long as he shall live, but only capital if he shall happen to die, notwithstanding his estate should draw precisely the same measure of income as if he had lived. Here again the mutuality is destroyed. Now the three men who signed this contract intended no such consequences. By what rule of construction can the same contract be thus transformed and made to mean capital and credit one day, and only capital the next day? We there-

fore say there is in this partnership no half-way point between absolute and complete dissolution at the date of the death of Roswell Blodgett, and a binding contract as to general assets of all partners up to March 31st, 1878, just as if Roswell Blodgett had not died. If the latter construction delays distribution for a limited time, prevents the payment of legacies and encumbers the estate, still the intent of these three partners is to prevail.

5. Upon principle as well as authority the general assets of a deceased co-partner are held liable for partnership debts where he has contracted for or directed such liability. *Scholefield* v. *Eichelberger*, 7 Peters, 594; Story on Part., § 319*a*; *In re Northern Coal & Mining Co.*, 16 Jur., 299; *Beveridge* v. *Beveridge*, 2 Pat. Scotch App., 1976; *Gratz* v. *Bayard*, 11 Serg. & R., 41; *Laughlin* v. *Lorenz's Adm'r*, 48 Penn. St., 275; *Davis* v. *Christian*, 15 Gratt., 11; *Whiting* v. *Farrand*, 1 Conn., 60; *Mason* v. *Tiffany*, 45 Ill., 392. Contingent and executory contracts bind an estate, although the demand may not accrue till after the death and distribution. *Davis* v. *Weed*, 44 Conn., 570; Gen. Statutes, 374, § 9; id., 388, §§ 5, 6.

PARDEE, J. When articles of agreement for the formation of a partnership are silent as to the matter of the death of a partner, as a legal result that event terminates the contract, for the reason that the law presumes that each member entered into it relying upon the industry and special skill or general ability of every other.

But it is in the power of the contracting parties to waive this consideration and suspend the operation of the general rule of law; and in this, as in most other matters, the law permits individuals capable of acting to bind themselves while in life, and after death their estates, by such contracts as they may see fit to make. Thus every man can enter into the partnership relation upon such terms as are satisfactory to himself and his associates and prolong the continuance of the obligations growing out of it during a term extending beyond his life.

By executing a partnership agreement without restriction as to liability, Roswell Blodgett subjected his entire estate to an obligation to respond to all debts contracted in the proper conduct of the business, and to the power of each of his associates to compel it thus to respond, having invested them for a term of years with an agency unlimited within the scope of the partnership undertaking—an agency coupled with an interest; and by his express agreement that his death should not dissolve the relation he continued the subjection of his estate to responsibility for contracts made by them after that event as fully as for those made during his life; for we are unable to discover any desire upon his part to establish a distinction between the period preceding and that following his death so far forth as the extent of hazard to his estate is concerned. And, to meet obligations thus to arise, he put upon his executors the duty and clothed them with the power to provide necessary funds by sale or pledge of assets; and this, whether we regard the original partnership as continuing, or the provision as to his death as an arrangement for a new one in its place after that event. This is as the law reads his agreement; and in interpreting this provision in the light of others in the same instrument, of the circumstances attending its execution, of the condition of the several parties and their relation to each other, and of their several acts performed under it, we think it is the meaning which he gave to it, which his associates had the right to and did give to it, and which he intended they and all persons dealing with and giving credit to the firm should give to it.

Nor is the right of the persons thus giving credit to be paid, or the duty of the executors to pay by sale or secure by pledge, at all affected by the fact that he left a will the execution of which may be long postponed or even rendered impossible by the disastrous result of the business; for wills speak only of property remaining after contract obligations are discharged; by no act or writing, testamentary or other, could he destroy or diminish either this right of those who upon faith in his contract trusted his estate, or the right of

his associates to all advantages to be derived from the privilege of continuing the business upon its credit. Therefore, the respondent, with knowledge of the terms of the partnership contract, could after his death safely accept from the executors of his estate a pledge of its assets as security for money loaned to the partnership for its proper uses, without inquiring as to the contents of his will.

It is the claim of the petitioners that it is the strong presumption of the law that the effect of this provision of the partnership agreement is not to make the entire estate of Roswell Blodgett liable for the debts incurred by the firm after his decease, but only such part thereof as prior to his death he had invested in its business, and that this presumption only gives way to a contrary intent clearly expressed. In support of this they have cited numerous cases in which creditors of a partnership, continued after the death of a member, have been denied access to his entire estate and have been compelled to accept only such portion of their claims as the amount of his capital actually invested at the time of his death would pay. But we believe that these cases, with one exception, are instances of the continuation of the business under testamentary provisions without any contract in relation thereto. In construing these, as in construing wills generally, the courts allow themselves to be led to conclusions by what they believe to have been the intention of the testator, and compel persons dealing with a partnership existing by testamentary permission to assume the hazard of rightly interpreting it in the light of that intention.

In *Ex parte Richardson*, 3 Madd. Ch., 130, articles of co-partnership provided that if Hargreaves, one of the partners, should die before the expiration of the term, the partnership should be continued and his estate be represented in it by such person as he should by will or other writing designate as his successor. He died, leaving a will, in which he provided that the executors and executrix should be his successors in the firm for the benefit of his estate. The court found in the language of the will an

intent to limit the risk assumed by the estate to the amount which the testator should have actually invested at the time of his death, making no allusion to the articles of agreement.   The case was made to stand upon testamentary intention.   But we cannot permit any or all of these cases to control us in determining the extent of the right to bind his estate which Roswell Blodgett, for valuable consideration received, conferred upon the surviving parties to a contract.   Moreover, if the provision had been found in a will, and the case could be made to depend upon the intention of Roswell Blodgett in placing it there, the result would remain the same.

It is true there are in the contract the following paragraphs, namely:—" and that to supply the needed additional capital said Roswell Blodgett shall furnish in cash within six months from the date of this instrument $2,500;" and " that if any capital can be spared from the business of the firm the same shall be paid to Roswell Blodgett or his legal representatives in reduction of the amount of capital furnished by him."   But, the money actually placed as capital in the treasury of a general partnership is but a part, often an inconsiderable part, of what is put at hazard; liability for debts may reach far beyond; and to this liability, as much as to the actual contribution of money, creditors look for security and ultimate payment.   Of course he desired as between himself and his associates to make his cash contribution as small as possible and to the utmost extent earn profits by his credit.   These provisions indicate no more than an expectation upon his part that such addition would suffice; that profits would accrue; and that upon these and the credit of the partners the business would live.

They cannot be interpreted as establishing the utmost limit to which creditors could force him, for, including this specified sum, his entire contribution to the capital of the firm would be only about $41,000.   Its indebtedness was at least $85,000; to provide for which, either by capital or credit, was, so far forth as creditors were concerned, a

burden which he could not remove from his own to the shoulders of his associates. And, it is to be noticed that he abstained from any effort to limit his liability by the statutory method provided for that purpose.

It is true too that he reserved for himself only such portion of the yearly profits as would be equal to seven per cent. upon the amount of capital which he contributed. But the significance of this concession is lost in the fact that his associates were chiefly to bear the burden of the business; and that they were his son and son-in-law, heirs expectant of his estate.

The Superior Court is advised to dismiss the petition.

In this opinion the other judges concurred.