MARY BROWN v. WILLIAM WATSON ET AL.

*Partnership—Mortgage of lands by survivor—Equity—Deposition.*

1. In this case a mortgage executed by a surviving partner on lands conveyed to the copartners jointly is held invalid as to the heirs of the deceased copartner, for reasons stated in the opinion.

2. As against the heirs of a deceased copartner, the survivor has no right to dispose of or incumber the interest of the deceased in copartnership lands for his individual debts, or for any purpose other than their disposition, by sale or otherwise, to close up the partnership business and pay partnership debts.

3. How. Stat. § 7475, authorizing the taking of depositions in Canada and the United States on a notice provided for in the statute of which said section forms a part, applies to suits in chancery.

Appeal from Osceola. (Judkins, J.) Argued April 19, 1887. Decided June 9, 1887.

Bill to foreclose a mortgage executed by a surviving partner. Decree below reversed as to widow and heirs of deceased partner, and bill dismissed as to them. The facts are stated in the opinion.

*More & Wilson,* for complainant.

*G. A. Wolf (Sayles & Trumbull,* of counsel), for defendants.

MORSE, J. Foreclosure of mortgage. Decree in the circuit court for the county of Osceola, in chancery, in favor of complainant.

The defendants Jane Trembath, Henrietta Watson, Lillian Watson, Charles Watson, James Watson, David Wolf, and Benjamin Wolf appeal to this Court.

The bill of complaint was filed April 1, 1884, to foreclose a mortgage, covering 1,246 acres of land in Osceola county,

executed by the defendants William Watson and Catherine Watson, his wife, on the eighth day of April, 1880, to David F. Watson, to secure the payment of $4,350, as evidenced by three promissory notes of the same date,—one for $1,650, payable in six months after date, and two for $1,350 due in one and two years after date. These notes were executed by William in his individual capacity.

At the time of executing this mortgage William Watson was the surviving partner of the firm of J. & W. Watson, which had been composed of his brother James and himself. The mortgage in terms conveyed,—

" All the interest of said William Watson, as survivor of himself and James Watson, deceased, formerly composing the firm of J. & W. Watson, and as a partner of said firm, and as an individual, of, in, and to" the lands described herein.

April 23, 1880, David F. Watson assigned the notes and mortgage to Marcus E. Brown, of the city of Grand Rapids. Brown died intestate April 7, 1881. May 9, of the same year, administration of his estate was granted to John W. Champlin and Mary Brown of that city, who duly qualified.

January 14, 1884, the probate court of Kent county decreed distribution of Brown's estate, and, by virtue of such decree, these notes and this mortgage were on that day duly assigned and delivered by Champlin, as administrator, to Mary Brown, the complainant and the widow of the said Marcus E. Brown.

James Watson died intestate on or about the twenty-second day of September, 1875. He left surviving him Jane Watson (now Trembath), his widow and four children, who were all minors at the time of the filing of this bill, to wit, Henrietta, Lillian, Charles, and James Watson. The defendants David and Benjamin Wolf claimed certain of the lands under a warranty deed from the defendant James Lunney, whose title was derived from the defendants William and Catherine Watson after the execution of the mortgage. It

is conceded that they have no standing as against this mortgage, and their solicitor claims that their only object in appealing was to bring properly before this Court the question as to the admission of a deposition in the case which will be referred to hereafter.

The main controversy relates to the interest of James Watson in the lands embraced in this mortgage. The complainant insists that the mortgage is a valid lien upon such interest, and his heirs deny it. The lands were mostly purchased in 1874 and 1875, and the deeds ran to "James and William Watson" or "William and James Watson." William Watson swears that the lands were bought and held as copartnership property, and at the time of James' death belonged to the firm of J. & W. Watson. There is no other proof in relation to the tenure of these lands as to whether they were owned in partnership or in common. No use had been made of them at the time of James' death. They were, however, not inventoried as a part of his estate, and seem to have been treated by William, the widow of James, and his administrator, David F. Watson, as copartnership property.

As I view the case it is not necessary to determine the character of the holding of these lands, or to discuss to any great extent the power of William Watson, as survivor of the firm of J. & W. Watson, to mortgage or alienate them. One thing is certain and beyond dispute. As against the heirs of James Watson, he had no right to dispose of or incumber the interest of James in these lands for his own individual debts, or for any purpose other than their legitimate disposition, by sale or otherwise, to close up the partnership business and pay partnership debts. He held the legal title, if they were partnership lands, in trust for these heirs, and he could not violate this trust by mortgaging them for his own obligations, or fraudulently, to one who did not take such mortgage in entire good faith.

David F. Watson, the mortgagee, was a brother of James and William, and knew all about their affairs. He was also administrator of his dead brother's estate. The consideration of this mortgage, as proven by William and David, is not satisfactory to me as to its amount in the first place. And, secondly, it is clear to my mind that the sum secured by it was never a partnership obligation. When James died, David had been working for the firm only about a month. He claims that the notes running with the mortgage in question were given in settlement with William at their date, and the amount represented by them was made up of $1,100 owing to him from the firm when James died; $1,200 that he lent William to carry on the business afterwards, and his salary. He claims to have worked right along under the hiring in August, 1875, until February, 1879. He was to have the same wages as he could earn at milling, which was his occupation before he commenced work for the firm. While employed, he admits drawing $1,400 out of the business.

I am not by any means convinced that he ever lent the firm any money before James died. At any rate I cannot find that he had any property, or was worth anything, when he commenced work. How he was able afterwards to lend William $1,200, and draw out $1,400, and have enough still coming to him from his salary to make an indebtedness of $4,350 to him from William, or the firm of J. & W. Watson, in February, 1879, is beyond my ability in arithmetic. His salary, under his own showing, could not have been over $50 a month.

When James Watson died, the firm was solvent, and worth, as appears from all the testimony, at least $15,000 over and above all liabilities. When William got through with the business, and absconded, there was not enough property to pay the debts. It is claimed that William had to keep on in the business of logging to fulfill the terms of two contracts, entered into by the firm before James' death, and from which

he could not obtain release, and one of them, at least, extended five years, and could not be completed in less than that time. These contracts were not put in evidence, and there is therefore no definite testimony as to what they contained, nor any proper proof of their existence. It also appears that William engaged in at least two other contracts after his brother's death, and the business was not kept separate from the others. William lost money steadily from the time he assumed control of the affairs of the firm until he became so deeply involved that he quit business and fled the country, leaving his creditors to secure by attachment what little was left of the truck belonging to a logging outfit.

Whatever was owing to David F. Watson cannot be considered in any sense as an obligation of the firm of J. & W. Watson. There is no satisfactory proof that the firm owed him anything when James died, and the interest of James in these lands could not be burdened with the individual debt of William. If David loaned William any money, there is no convincing proof that it was used in closing up the partnership business, and there is a strong hint in the proofs that David, as administrator of James' estate, was carrying on business as a copartner of William. David admits being informed by Judge Sayles of the Osceola probate court, when he came to settle his accounts in that court, that he had no right to engage in such a partnership, and that he had done wrong in taking the advice of others to the contrary.

There are some singular things connected with the management and settlement of this estate which may be referred to here. The action needs explanation, but none is given or offered. David was appointed administrator in November, 1875. Nothing but personal property was inventoried. The estate was appraised at $5,634.81. Among the claims filed and proven against the estate was a claim of "J. & W. Watson, logging job, $1,314.38," one-half of which was paid over to William. Another claim was, "Expenses of Dodge,

Phelps & Co. lawsuit, $169.75.'' One-half of this claim was paid by the administrator, leaving the other half to be paid, presumably by William.

It appears from the administrator's account that the firm of J. & W. Watson paid over to the estate in January, 1877, the sum of $2,800.13. There is no proof why this was paid, but it would look as if, at that time, William supposed that there was that amount at least in cash due James' estate out of the partnership business. Later on, in March, 1879, about the time that William becomes a bankrupt, the administrator shows on hand, as a balance in his hands of the estate, $5,460.81, which he returns he has turned over to William, as the "surviving partner of James Watson, deceased," and obtains his discharge. All that the heirs of James have in the meantime received from the estate of their father, is their support four years while living with their mother; an allowance being made her of $50 per month.

When William ascertained that he could go on no longer, and that he had lost or wasted, not only his own property, but that of the estate also, he made his individual notes to David for the sum of $4,102.73, and secured the same by the execution of a mortgage upon his individual interest in these lands. This must have been done either for the purpose of securing David what he owed him, or to cover up and save something to himself from his interest in the lands. These notes and the mortgage were made and delivered to David, July 1, 1879, and he accepted and held them until April 8, 1880, the date of the mortgage in controversy here. The natural presumption arising from this transaction is that both William and David regarded this indebtedness in July, 1879, if any existed, as the individual obligation of William. This presumption is strengthened by the fact that both of them testify that the mortgage was so given because William thought he had no right to incumber his brother's interest.

The present mortgage was made at the suggestion of the

husband of complainant, Marcus E. Brown. David under-
took to sell the mortgage of July, 1879, to Brown, but
Brown did not wish to purchase it as it was. He suggested
that William give a mortgage upon his own and James'
interest, and he would buy. Thereupon the individual mort-
gage was released, and the notes canceled, and the present notes
and mortgage executed, and later transferred to Brown.
Brown, therefore, took the mortgage with notice, and had
no greater equities against the interest of James than David
possessed. At the same date of the mortgage in question here,
April 8, 1880, William also executed to David a chattle mort-
gage, in the name of himself and as surviving partner of J.
& W. Watson, covering all the personalty belonging to the
logging business, to secure the same sum of $4,350. This
chattel mortgage was also assigned to Brown, April 23, 1880,
the same day of the transfer of the mortgage to him. If it
had not been for Brown, through whom the complainant
claims, and whose title she holds as he held it, it is not prob-
able that either William or David would have known enough,
or thought, to have attempted to convey away the last parcel
of property, real or personal, standing in the name of or
belonging to the father of these infant defendants.

I cannot find a single equity that requires the enforcement
of this mortgage against the interest or title of James Watson
in these lands. Obtained in the manner that it was, sup-
ported, to say the least, by a very slim and doubtful consid-
eration, and bearing the badges of fraud and suspicion as
regards the rights of these children, it does not commend
itself to the conscience of the Court. I cannot believe from
the testimony that either William or David intended in the
first place to make a claim that the copartnership of J. & W.
Watson was indebted to David, or to use these lands in the
copartnership business. David held for over nine months
the individual paper and mortgage of William. He tried to

dispose of them to raise money. While he was in want of money, and could not obtain it upon William's mortgage, the evil suggestion of Brown came, and the temptation was too strong to be resisted. It may be that Brown thought that William had a right to dispose of James' interest in these lands, and the suggestion on his part, and his intention, may have been innocent of wrong-doing, but, in the light of the previous action of William and David, it was to them an evil suggestion, and they knew they were moving in fraud of the rights of their nephews and nieces.

Nor do I think there can be found any justice in the claim of Brown, or the complainant as his heir, against James' interest in these lands. If Brown was innocent of intended wrong, he had facts enough before him to put him upon inquiry, both as to the consideration of David's claim against the firm of J. & W. Watson, and as to the power and authority of William to mortgage the lands.

The interest of James belongs to his children, subject to the dower right of the widow, Jane Trembath, and such interest ought not to be taken away from them, and will not with my consent, in a court of equity, upon such facts and circumstances as appear in this case. Sometimes conveyances to good-faith holders hamper and restrict the courts in granting relief to infants who have been defrauded by those whose duty it was to protect them, or whose patrimony has been wasted in violation of fiduciary relations or trusts. But here there are no such difficulties in the way. We are asked to confirm a wrong, which confirmation can be easily and rightfully refused without injury to any innocent person. The complainant, as his heir, stands in the shoes of Marcus E. Brown. He suggested this mortgage under circumstances that charged him with notice, and deprived him of any lawful claim of *bona fides*. The complainant must take this mortgage as her husband received it; and he received it bur-

dened with the invalidity, as against the property of James, that rested upon it at its execution, and which has never since been lifted from it.

The decree of the court below will be reversed as against the defendants Jane Trembath and Henrietta, Charles, Lillian, and James Watson, and the bill of complaint as against them dismissed, with costs of both courts. And the mortgage is declared null and void as against the interest of James Watson, deceased, in the lands described therein, and the same must be canceled and released as regards such interest.

In relation to the defendants David and Benjamin Wolf, it is admitted that their title is derived from William, and therefore subject to his mortgage, which was a lien upon the premises before their purchase. They come into this Court, it is said by their solicitor, to raise an objection to the deposition of William Watson, which was admitted in the case. Watson resided at Mitchell, in the territory of Dakota, at the time his testimony was taken. His deposition was taken upon notice, under section 7475, How. Stat. It is claimed that this statute does not apply to suits in chancery, but we are satisfied that it does.[1]

The decree will therefore be affirmed, with costs, as far as the defendants Wolf are concerned.

CAMPBELL, C. J., and SHERWOOD, J. concurred.

CHAMPLIN, J., did not sit.

[1] See *Colton v. Rupert,* 60 Mich. 320 (head-notes 9, 10), *Thompson. v. Clay,* Id. 628 (head-note 3), for important rulings on this statute.