FREY v. EISENHARDT.

1. ESTATES OF DECEDENTS—PARTNERSHIP—RIGHTS OF SURVIVING PARTNER.

A surviving partner cannot, by will, confer upon his executor a right to continue the business for any longer period than he himself might lawfully have continued the same, which is limited to such time as is necessary to close out the business without sacrificing it.

2. SAME—TRADE DEBTS—PROPERTY SUBJECT TO.

Where an executor or administrator, instead of closing out decedent's business with reasonable promptness, assumes, with the consent of the parties interested, to conduct the same as a going concern for a series of years, contracting extensive debts and sustaining heavy losses, only the trade assets—i. e., the property employed in the business or resulting from it—can be subjected to the payment of such debts.

3. SAME—WIDOW AND CHILDREN—ALLOWANCES PENDING SETTLEMENT.

Nor will decedent's widow and children be compelled in a court of equity, as a condition to their being allowed an injunction restraining the application of the general assets to the payment of the trade debts, to refund amounts which had been allowed to them for their support out of the funds of the estate when the same was solvent.

4. SAME—TRADE ASSETS—WHAT CONSTITUTE.

Premises purchased by two brothers in their individual names, with moneys taken from the funds of a brewing business, in which they were copartners, at a time when the firm was entirely solvent, and occupied for years by their families under circumstances indicating that they regarded them as their respective homesteads, will not be held liable as trade assets for the payment of debts contracted by the administrator of the partners, who ran the business to insolvency, although it appears that water for the use of the brewery was procured from a pipe running across the property, that empty beer barrels were at times piled upon the lots, and that employés sometimes boarded with the families.

Cross-appeals from Kent; Grove, J. Submitted November 6, 1897. Decided March 15, 1898.

Bill by Caroline B. Frey and others against Jacob Eisenhardt and others to enjoin an administrator's sale. From the decree rendered, complainants and defendants Mary Frey, Mary M. Oswald, and Chrisitan F. Frey appeal. Reversed.

*Charles B. Blair*, for complainants.

*Crane, Norris & Stevens*, for appealing defendants.

*S. Wesselius* and *Frank W. Hine*, for defendant Eisenhardt.

*J. T. Preston* and *Birney Hoyt*, for other defendants.

MOORE, J. Carl Frey and Christian Frey were partners, doing business at Grand Rapids as brewers, conducting the Coldbrook Brewery, under the name of Frey Bros. Carl Frey died November 12, 1885, leaving a widow and six minor children. Upon his death, John Sehler was appointed his administrator. Christian Frey continued to conduct the business until his death, which occurred March 12, 1886. He left a widow and two minor children. Prior to his death, Christian Frey made a will disposing of his property, and containing this provision:

"I hereby nominate and appoint my brother-in-law, William Burgtorf, executor of this, my last will and testament, to carry out all the provisions of this, my last will, and see that the same is done according to the spirit of the same, and to assist, advise, and assist to manage said property, both real and personal; and if at any time it appears advisable to my said wife and executor to convert my said property, both real and personal, into money, then they shall act in the premises as to them shall seem to be for the best interest of my said estate; on the other hand, if it shall seem to them best and proper to keep said property and carry on said business, then it shall be their option so to do."

116 MICH.—11.

Burgtorf qualified as executor, and, instead of closing up the business, ran it, in connection with Sehler, administrator of the estate of Carl Frey, until October, 1890, when Jacob Eisenhardt was appointed administrator of both estates. Burgtorf and Sehler, at the time of their resignations, filed with the probate court their final accounts, which were allowed, and they were discharged. It will appear a little later what the condition of the estate was at the commencement and end of Mr. Burgtorf's executorship, and at the commencement of Mr. Eisenhardt's administration, and at the time of filing his last account. Mr. Eisenhardt, instead of closing out the business at once, continued to conduct it as a brewery business, making large improvements to the plant, and incurring many debts.

In December, 1892, the brewery plant was sold at probate sale for $18,000. After this sale, the administrator filed a petition in which he claimed that the indebtedness incurred by him in conducting the business should be paid *pro rata* out of the fund realized from the sale of the brewery. A contest was made over this claim in the probate court, at which time it was also claimed that the lands belonging to the estate were not liable for debts incurred by the administrator, even though the brewery plant was liable. An arrangement was finally made in August, 1893, between the heirs of Carl Frey and the administrator, that the fund realized from the sale of the brewery might be used to pay debts and expenses of administration, upon condition that the lands now in question should be exempt from paying any of the outstanding claims. This fund was so used, but the administrator claims that, because the creditors would not consent, he could not carry out the arrangement. In May, 1894, he petitioned the probate court for leave to sell the lands in controversy, to pay the outstanding debts and expenses of administration. The complainants, who were the minor children of Carl Frey, filed this bill to enjoin the court from subjecting the real estate then unsold, which was appraised in the original

inventory at less than $6,000, to sale, because of the out-standing debts, and asking that a portion of the property might be found to be the homestead of the widow and heirs of Carl Frey, and another portion be found to be the homestead of the widow and heirs of Christian Frey, deceased, and that, as to the balance of the real estate, an undivided one-half thereof might be declared to belong to the complainants, because in equity it belonged to them by virtue of the partner's lien, which arose on the death of Carl Frey. The widow and heirs of Carl Frey, and the widow and heirs of Christian Frey, have, since the filing of the bill, adjusted their respective rights as between themselves, so that particular feature of the bill is not very important. In the hearing below, it was the judgment of the trial court that the administrator had acted in good faith; that the lands in controversy were partnership lands, and should be subjected to the payment of the outstanding liabilities; and dismissed the bill of complaint. The case comes here by appeal.

The complainants claim as to the estate of Carl Frey that, as there was no will, it was not competent for the administrator to continue the business, but it was his duty to close it out within a reasonable time; and that, if this had been done, the debts would have been paid, and a handsome surplus left to divide among the heirs. It is also claimed that if, because of the provisions of the will of Christian Frey, the administrator was authorized to continue the business as a going business, any debts incurred would be trade debts, which must be paid out of the trade assets, and that none of the assets outside of the brewery plant could be used to pay the trade debts. They also say that the original debts have been paid, but, if it should be conceded that they have not been, that, because of lapse of time, the real estate cannot now be sold to pay them. The administrator claims that what he did was done in good faith, with the knowledge of the widows and the guardians of the minors, and the approval of the court, and for the purpose of conserving the

property; and that the debts made by him and the expenses of administration should be paid by the property of the estates, even though it takes all of it to pay them. It is the claim of complainants that the estates of Carl Frey and Christian Frey were solvent at the times of the death of the persons constituting the partnership. This is admitted by counsel for the other parties to the litigation. The inventory and appraisal made by Mr. Burgtorf as executor, in April, 1886, shows the assets to be upwards of $66,000, and the debts to be less than $22,000, leaving a surplus of upwards of $44,000. The inventory and appraisal made by Mr. Eisenhardt, administrator, October 1, 1890, shows the assets to be about $60,000, and the liabilities about $13,000, leaving a surplus of upwards of $47,000. As before stated, Mr. Eisenhardt, instead of closing out the business and converting the assets, made extensive improvements of the property, and ran it as a going concern. The record discloses the widows knew this was being done, though it is claimed they did not know it was done at a loss. The judge of probate was also consulted from time to time, but no order was ever made extending the time for settling the estates, or authorizing the administrator to conduct the business as a going business. Doubtless this was done with the best of motives, but it was very unfortunate for everybody concerned.

It is urged that, as a result of the administration of Mr. Eisenhardt, a profit was earned to the estate; but a careful analysis of the facts disclosed by the record shows this to be a serious mistake. It has already appeared that, when Mr. Eisenhardt began the management of the estate, it was worth, according to the appraisal, over and above its liabilities, upwards of $47,000. The administrator's expense account from October 1, 1890, to January 1, 1893, in carrying on the business, exceeded the receipts of the business by nearly $10,000. The administrator has sold all the property belonging to the estate when he became administrator, except the real estate involved in

this controversy, which was appraised in the original inventory at $5,300, and some accounts and personal property, which he says are worth not more than $750. This real estate has now depreciated in value, so it is now worth, according to the brief for the administrator, $3,850. It is sought by the administrator to have this real estate sold to satisfy debts and expenses of administration which existed January 1, 1893, to the amount of upwards of $8,000. It will be seen by this statement that not only has there been no profit growing out of the administration by Mr. Eisenhardt, but that the surplus of $47,000, less the real estate, now valued at $3,850, and the small amount of personal property, has disappeared, and that there is an indebtedness of upwards of $8,000 yet unpaid; so that, after absorbing all of the estate, there would be more than $4,000 of debts remaining. It is true, there has been a large shrinkage in values, but it is also true that the administrator has realized more than enough, out of the sales of real estate, to pay the debts which were in existence when he took possession of the estate.

Carl Frey did not make a will, so that no power was conferred, so far as his estate was concerned, to continue the business. The will of Christian Frey did not direct that the business should be continued, but left it to the discretion of his widow and his brother-in-law, Mr. Burgtorf, to carry on the business; but it did not leave it to the discretion of any one else to do so. The death of Carl Frey dissolved the partnership. The surviving partner had the right to continue the business long enough to close it out, without sacrificing it (*Loomis* v. *Armstrong*, 49 Mich. 521; *Brown* v. *Watson*, 66 Mich. 225; *Van Kleeck* v. *McCabe*, 87 Mich. 602); but he did not have the right to continue it for a series of years as a going concern, and he could not confer upon his executor a right he did not possess himself.

When Mr. Eisenhardt took control of the estate, there was, according to his testimony, but $65 in money on hand. There was a large quantity of beer, according to

his testimony, some of which was spoiled, and the balance of which was soon spoiled, so it had to be thrown away. He at once, without an order of court, and after the time fixed by sections 5918 and 5919, 2 How. Stat., for the settlement of claims against estates, had expired, began to borrow money to improve the plant, to buy new stock; he expressing his intention to be (after having conferred with the widows and Mr. Blickle, guardian) "to run it as a live business, under the will and authority of Christian Frey and the consent of the guardians and the respective widows, for the joint benefit of both families, so as to enable them to live from the business. These families had no means of support except from the proceeds of these estates, that I know of." He increased the debts more than $10,000 the first year, and even more the second year, and continued to run the business as long as he could borrow money to do so. It is said by counsel that his purpose in doing this was to keep the business running until a purchaser could be found, and that, where there is a long-established business, the administrator may continue the business for a time, for the purpose of holding the business, and until a sale can be made and the business closed; citing *Poole* v. *Munday*, 103 Mass. 174; *Merritt* v. *Merritt*, 62 Mo. 150; *In re Benedict*, 13 Abb. N. C. 67; *Collinson* v. *Lister*, 20 Beav. 356. They also say it may be done under the terms of a will; citing *Packard* v. *Kingman*, 109 Mich. 497. In the last-named case the testator was careful to provide how the trust might be executed, and for what period of time, and by whom. In deciding what the executors might do in that case, the court was careful to say:

"And while we do not mean to imply that his trustees might enlarge his obligations already existing, by furnishing new and additional financial aid to the corporations mentioned in the bill, we are of the opinion that they might properly, and where it should appear for the best interests of the estate, extend or renew existing obligations of the estate, or borrow money in the usual course of business to meet obligations when due. * * * While we hold

that it is within the power of the executors to perform the acts mentioned, and, therefore, that the estate would be bound thereby, we do not overlook the rule that the effect of such contracts is usually to bind the trustee personally, and that the other contracting party must pursue his remedy against the trustee. This doctrine is established by a list of cases, long and generally uniform,"—citing a long list of cases.

In *Collinson* v. *Lister, supra,* it was said that "an executor cannot carry on the trade of the testator, except for the mere purpose of winding it up; but the executor may, and in some cases is bound to, complete contracts entered into by his testator,"—citing a number of instances. In that case it was held that the executor could not charge the estate as he sought to do.

In *Re Benedict, supra,* the testatrix had conducted a young ladies' seminary for about 30 years. Eleven weeks of the school year remained at the time of her death. Her executor kept the seminary in operation for the remaining 11 weeks, and until the end of the school year; and it was held that this was right, for he was thus fulfilling the various contracts to which the decedent had made herself a party.

In *Merritt* v. *Merritt, supra,* decedent left half of his estate to his widow, who was also his administratrix. The estate included an hotel furnished and in operation, which was held under a lease requiring $1,000 rent to be paid monthly. When her husband died, she could not dispose of the hotel furniture. It was appraised at upwards of $11,000, but could not be sold at auction for more than $8,000. The administratrix decided to continue the business till a more favorable time for selling arrived. She kept the hotel for a little over a year, and sold the furniture for $20,000, $18,000 of which she collected, but the purchasers became bankrupt before the remaining $2,000 was collected. She accounted to the estate for the $18,000, and it was sought to make her lose the $2,000. The court said: "She was only endeavoring to secure, preserve, and take care of the effects till she could advantageously get them

off of her hands.   It would be inequitable that she should bear all the loss, and the estate reap all the benefits resulting from her skill and care."

In *Poole* v. *Munday, supra,* the intestate died in 1862, leaving a widow, and a daughter 18 years old, and a son 20 years and 10 months old.   There were no creditors interested.   The business was that of wholesale and retail butcher.   The widow and children requested the administrator to keep the business going until the son became of age, and it was kept going until March 2, 1863, when it was sold to the son.   It was held that, under the circumstances of that case, the account of the administrator must be allowed.

It is not believed, however, that a case can be found anywhere which holds that, if the executor or administrator runs the business as a going concern for a series of years, he can charge the estate with the deficiency if the business results in a loss.   The true rule is as follows:

"An administrator is not justified in placing or leaving assets in trade, for this is a hazardous use to permit of trust moneys; besides which, trading lies outside the proper scope of administration functions.   Under circumstances not clearly imprudent, however, an executor may pursue an authority which was plainly conferred upon him by the will in this respect; though less as an executor, perhaps, than as one specially honored or burdened by his testator's personal confidence.   Chancery protects the executor who can show his testator's express sanction, but scarcely beyond this, and chiefly so as to keep the hazardous investment under its prudent direction.   To employ trust funds in trade on the representative's own responsibility has always been treated as essentially a breach of trust; and the courts have resisted much pressure to relax the rule.   * * *   For the loss of assets placed or left by him in trade, he may be charged as for his imprudence. * * *   But as to withdrawing assets from a partnership, or closing out a business in which the decedent was engaged, a wider discretion must occasionally be conceded.   * * *   An administrator is not necessarily wanting in due care, so as to be responsible personally, if he suffer the surviving partner to remain in possession

of and sell out the joint stock in the usual course of trade. * * * These principles apply to speculative investments of all kinds with the assets. * * * But if assets came to him thus invested by the decedent, it is a question of prudence when and how he shall withdraw the fund; and though he is not justified in continuing the speculation, and involving the estate more deeply, a reasonable latitude of honest discretion should be allowed him as to closing the transaction. * * * Where the business of the decedent is carried on by executors under a will, or by representatives duly empowered, * * * the representatives incur a personal liability for the debts thereby contracted. They are not absolved from accounting for the property. But they have a right in equity to indemnify themselves for the payment of such debts out of the property lawfully embarked in the trade. Out of this right springs an equitable right of the trade creditors to resort to such fund for payment, if their remedy against the representative be unavailing. * * * Where, on the contrary, the executor or administrator carries on a trade without any authority to do so, and the business proves disastrous, this will not of right involve the decedent's estate for the debts; but such assets as may be shown to have been wasted in the trade, those interested in the estate have the right to claim. * * * Acts of the representative *ultra vires*, or in excess of his express power to trade, do not give those dealing with him an equity against the trade assets." Schouler, Ex'rs, §§ 325, 326; *Ward* v. *Tinkham*, 65 Mich. 698.

As already stated, no order of court was obtained authorizing the executor to continue this business. No guardians *ad litem* were ever appointed for the minor children. What was done cannot be regarded as done with their consent. Their interests in the estates of their fathers, at the time Mr. Eisenhardt became administrator, upon any reasonable basis, would exceed the value of the real estate now left; and we do not think it competent to subject these lands to sale for trade debts.

It is now claimed that payments have been made to the widows and children out of the funds of the estate, and that the estate should be reimbursed for those amounts, or that the widows and minor children should be compelled

to do equity before the claim in the bill should be sustained. These payments were made by direction of the probate court, and nearly all of them were made before Mr. Eisenhardt became connected with the estate. When the bulk of the payments were made, the estate was solvent, and had funds with which to pay them. The widows and minors were entitled to their support during the progress of the settlement of the estate, and they cannot now be required to repay this money because the administrator has lost money in the management of the estate. *Dunlap* v. *J. P. Donaldson Co.*, 74 Mich. 290.

This estate affords an illustration of the dangers growing out of continuing estates along without settling them. Here was an estate worth, after paying all its debts, upwards of $40,000. This estate belonged to two widows and eight minor children. Instead of being settled as it should have been, it was managed first by the administrator of one estate and the executor of the other, and then by the administrator of both estates, for the period of eight years. This management resulted in such a way that the estate is all gone, if the expenses of the management and the debts are all paid. I do not question the good faith of the executor and the administrators, but they did what the law does not permit. As already stated, this estate was solvent, and all of its original debts have been paid. The widows are shown to have been consulted about the continuance of the business. The proceeds of sales already made have been distributed, and it is not necessary to discuss here the effect of that distribution. We understand the rule is that where an administrator or executor, instead of closing out a business, continues it, even when authorized by will to do so, the trade debts will reach only the trade assets; that is, the property that was employed in the business or that was the result of doing the business. *Laible* v. *Ferry*, 32 N. J. Eq. 791. See, also, *Altheimer* v. *Hunter*, 56 Ark. 159; *Lucht* v. *Behrens*, 28 Ohio St. 231.

It becomes important, then, to inquire whether the

property described in the bill of complaint is part of the trade assets. It is pretty clearly established by the record that when the firm of Frey Bros. was entirely solvent, as early as July, 1873, money was taken from the business of the firm, and a deed was obtained running not to Frey Bros., as partners, but to Christian Frey and Carl Frey; that a year later the family of Christian Frey took possession of this property, and occupied it as a home until the death of Christian Frey, and since his death it has been occupied continuously by his widow and children. It also appears that as early as August, 1878, another piece of property was bought and paid for in the same way, which was at once occupied by the family of the other brother as its home, until his death, and since his death has been occupied by his widow and children as their home; and by direction of these men at one time quitclaim deeds were drawn for the purpose of creating homesteads of these properties, but for some reason were not signed. The record discloses that, when this property was obtained, it was for the purpose of having one part of it as the home of Carl Frey and his family, and the other part as the home of Christian Frey and his family, and it has been so treated by all the parties in interest. While it is true, water has been procured from a pipe running across one of these properties, for the use of the brewery, at times, and at times employés of the brewery have boarded in the families occupying these houses, and while at times empty beer barrels have been piled upon one of the lots, neither of the administrators nor the executor have regarded these lands as part of the brewery plant; and, when an order was obtained to sell the brewery plant, no effort was made to treat these lands or city lots as part of that plant. We do not think this property can in any sense be called "trade assets."

On the other hand, the fund arising from the sale of the brewery plant and the personal property was doubtless trade assets, that could be reached by trade debts.

The decree of the court below should be reversed, and

one entered here enjoining the defendants from selling the land described in the bill of complaint, and confirming the title therein as now determined between the widows and minor children. Inasmuch as it was necessary to file this bill to decide the rights. of the respective parties to the real estate, costs will not be granted to either party.

The other Justices concurred.