## COWHAM v. SHIPMAN.

1. PARTNERSHIP—DEATH OF PARTNER—DUTY OF SURVIVOR.

On the death of one of two partners in a venture having for its object the collection from the government of claims in favor of certain Indians, it became the duty of the survivor to collect the assets, pay the debts, and wind up the concern.

2. SAME—CONTRACTS—LIMITATION—EXPIRATION OF PERIOD.

Though the contracts by which the partners were authorized to prosecute the claims were limited by their terms to a period which had expired at the time of the death of the partner, it was proper for the survivor to continue to make efforts to collect under them, where they were still being acted upon by the parties.

3. SAME—DUTY OF SURVIVOR—PROSECUTION OF BUSINESS.

After final defeat of the enterprise, and the ending of all hope of obtaining anything for the Indians owing to the disbursement of the fund by the government, all legal obligation to the Indians and to partner's representative was ended, and the survivor was under no duty to proceed further, since he could not do so with any expectation that he would thereby be able to have any portion of the expense allowed against the estate in case he should fail in his efforts.

4. SAME.

It was the survivor's duty to dispose of the asset if possible, if it was worth anything in the market, or, if he appropriated it to his own use, to recompense the deceased's estate for it, or allow it to share in the proceeds.

Appeal from Branch; Yaple, J. Submitted October 25, 1907. (Docket No. 143.) Decided March 31, 1908.

Bill by William F. Cowham, special administrator of the estate of Edward Twiss, deceased, against John B. Shipman for an accounting. From a decree dismissing the bill, complainant appeals. Reversed and remanded.

*T. E. Barkworth*, for complainant.

*Mark S. Andrews*, for defendant.

HOOKER, J.  Twiss, a doctor sustaining intimate relations with certain Pottawatomie Indians, interested Shipman, a lawyer, in a project to collect from the Federal government their share of certain annuities due them under a treaty of 1833, made with that tribe. Twiss secured two contracts, made in 1888 and 1889 respectively, with a large number, but by no means all, of said Indians, by which the copartners agreed to attempt the collection of the shares of said Indians for a contingent fee of 10 per cent. Shipman made strenuous efforts to do this. He was instrumental in getting Congress to pass a bill submitting the matter to the court of claims.  He began an action in said court and prosecuted it to judgment in conjunction with another suit begun by one Critcher for other and possibly some of the same Indians who had contracted with Twiss and Shipman, and in 1892 a judgment was rendered in favor of Critcher's Indians and against those represented by Shipman and Twiss, and this was affirmed by the Supreme Court in 1893.  *Phineas Pamto-pee* v. *U. S.*, 148 U. S. 691.

Appropriations were made to pay these annuities, and finally an arrangement was made by the government under which it appropriated and disbursed $156,000 in liquidation of all claims held by said Indians.  One of the provisions of the bill was that amounts due counsel should be withheld and paid to them.  For about two years after said appropriations Shipman made repeated attempts to obtain the commission which he and Twiss claimed that they were entitled to, but without success, both the commissioner of Indian affairs and the secretary of state denying this claim, the last decision being rendered on May 25, 1896.  The money was distributed to the Indians, or to them and Critcher, in November and December, 1896, and Shipman received none of it.

The two contracts were limited to five years from January 1, 1889.  In August, 1894, a writing executed by Shipman was made and this was found among the papers of Twiss after his death, which occurred May 12, 1895. A copy follows:

" For value received, I do hereby sell, assign, transfer, and set over to Edward Twiss, his personal representatives and assigns, a one-half interest in all contracts made and to be made with Pottawatomie Indians in relation to claims against the United States under various treaties with said Indians, said contracts consisting of several papers, but all dated April 5, 1894, or since then, said contracts having been originally intended for the joint benefit of both, but being made in my name for convenience.

"Aug. 2, 1894."

By the death of Twiss the copartnership was dissolved, and, as already appears, Shipman continued his efforts to secure the commission from the fund of $156,000 then in the hands of the commissioner of Indian affairs, of the department of the interior. He afterwards began a suit as survivor, in the court of claims, in the further effort to collect the commissions.

About the year 1898 we find him making an effort to adjust the matter with the executor of Twiss, recognizing that the estate had an interest in the claim then pending. The correspondence shows that he was unwilling to be to the expense of continuing his efforts, and he threatened to quit and go home from Washington, where he then was, if he could not make some arrangement about the matter. On February 9, 1898, he wrote:

"*My dear Jo:*
" I don't believe I shall ever get a cent from the govt. for fees in the Indian matter without a suit in the court of claims. All this is expensive and tedious. Now what will the executor of Dr. Twiss do in the premises? I mean how much or rather how little will he take if I get anything and be satisfied? I presume I am out five dollars to his one so far. How much is his expense account? I don't feel like going ahead without more knowledge for I shall earn all I get and if I must pay much of it out I will not go on with the uncertainty also of success. Please write.
                              " Yours,
                              "JOHN B. SHIPMAN."

On March 20, 1898, Shipman wrote:

"*My dear Jo:*

"Your letter is too uncertain in the Indian matter to do business on. I must have something definite if I am to go ahead. I propose to go on, furnish the funds necessary and out of the avails give the estate one-sixth and take the balance, this division to be in full for all claims in the matter including disbursements past and future. If I had not so much in it now I would not do this, but what I get is clear gain or would be rather if I let go now and I am willing to take some chances on getting part of it back, if not the whole, but you see it will involve another appropriation by Congress to get it even if I go into and succeed in the court. And then the amount would be uncertain, thus: would ten per cent. be figured on the proportionate number I actual represented who ought to have been paid? If so, the amount should be over $7,000. Or the number actually paid. If this is the basis it would be much less. Now if you accept, send a little agreement to the effect mentioned, signed by you as executor of the estate at once, or if you choose, send it in duplicate, both signed and I will sign and return one to you. If you will not, say so and end it.

"Hastily yours,
"JOHN B. SHIPMAN."

As late as March 23, 1898, the executor wrote:

"*My friend John:*

"I have your letter of the 20th inst. Do you think I have the authority to make this agreement which you request? Suppose the judge should say I had not? In that case would not J. W. McCausey have to do about what he (the judge) will say is right? I am perfectly willing to make any agreement that will satisfy the parties who are interested in the will, but I would not think it would do for me to act upon my own motion in the matter. The heirs or legatees should be heard and the judge should give me some authority in the matter. The will has not been proved? No? I will let the whole business drop before I will put myself in shape to be squeezed at the last end. I may be wrong concerning my liability, but if I am, I don't see why any executor may not dissipate and go as you please with any estate. You certainly should have good pay for your time and money and the chances you take if you go on with the case, but I don't believe that I have the right to say what that shall be.

"Very truly,
"J. W. McCAUSEY."

In 1903 Congress passed an appropriation bill providing $78,000 for certain Indians who did not share in the former distribution. This probably included some Indians who had been parties to the original contracts. Shipman testified that it included a much greater number who had not. There is little doubt that Shipman was instrumental in obtaining this legislation, and he is shown to have paid a large sum of money for assistance in the matter.

In 1904 he obtained contracts from many Indians to collect their share of this appropriation for a contingent fee of 25 per cent., and he ultimately received some $19,000 as such fee, from the fund. One claim in this case is that these contracts made in 1904 were covered by the assignment of 1894, of a half interest in certain contracts, and the administration asks a decree to that effect and an accounting. The bill was dismissed and complainant has appealed.

The relation between Twiss and the defendant was that of copartners. On the death of Twiss, in 1895, it became the defendant's duty to collect the assets, pay the debts, and wind up the concern. These contracts, although limited by their terms to five years, were still being acted upon by the parties, and it was proper for defendant to continue to make efforts to collect under them. *Tompkins* v. *Tompkins*, 18 S. C. 1; *Ayres* v. *Railroad Co.*, 52 Iowa, 491; *Oliver* v. *Olmstead*, 112 Mich. 483; *Clay* v. *Field*, 34 Fed. 375.

But after his final defeat in 1896, and when all hopes of obtaining anything for his clients under appropriations already made were ended by the disbursement of the fund, there was no further legal obligations to the Indians or to his copartner's representative to proceed further with the contract, as he could not do so with any expectation that he would thereby be able to have any portion of the expense allowed against the estate in case he should fail in his efforts. He would proceed at his peril and this he was not under obligation to do. *Matteson* v. *Nathanson*, 38 Mich. 377; *Potter* v. *Tolbert*, 113 Mich. 486; *First Nat.*

*Bank of Cooperstown* v. *State Sav. Bank of Ionia*, 130 Mich. 332; *Frey* v. *Eisenhardt*, 116 Mich. 160.

What was his further duty? Under the circumstances, it can hardly be said that he could bind his copartner's estate to share the expenses of an uncertain effort to obtain a further appropriation, and if he attempted anything of the kind it would have to be at his own risk. Twiss was dead and could furnish him no assistance in getting an extension of the contracts from the Indians who had made the original contracts, or new contracts from others. We think that he was under no further obligations to the representatives of Twiss, i. e., no obligations to make further efforts to perform the original contracts with the Indians.

The fact remains that he did pursue the scheme of collecting claims under the treaty in the manner stated, and made no effort to dispose of any interest that the copartnership had in the contracts, except as before doing it, and as early as March, 1898, he proposed terms in which he would take the estate's interest, assume the burden and chances, and pay contingently an aliquot part of the proceeds that he might receive by way of compensation. See letter of March 20th, above. This was five years before the new contracts were made and some years before the appropriation was made. He may not have contemplated a new appropriation or 25 per cent. contracts, or contracts with new Indians, and it is not strong evidence of the market value of the interest of the copartnership.

The copartnership owed no further duty to the Indians. The defendant owed no further duty to his copartner's representative, in the way of attempting to perform the contract. It was his duty, however, to dispose of the asset if it was worth anything in the market, if possible, and if he appropriated it to his own use, to recompense the estate for it, or to permit it to share in the proceeds. See *Freeman* v. *Freeman*, 142 Mass. 98; *King* v. *Leighton*, 100 N. Y. 386; *McClean* v. *Kennard*, L. R. 9 Ch. App. Cas. 336.

It is somewhat difficult to determine what, if any, value

the rights under the contract had, and what, if anything, they contributed to the success of defendant's last effort. It is probable that they were of some use and aid to him, and equity demands that whatever it was he should share with the estate. In defendant's letter of March 20, 1898, he offered one-sixth of the proceeds to be allowed to go on with the matter, and we will adopt that as the only evidence of value in the record.

We do not overlook the fact that complainant seems to base his claim largely on an assignment dated in August, 1894. Of this it is enough to say that this record fails to include any contract therein described or to which it has reference. It has been quoted, and clearly refers to some contracts with Indians which bore date prior to the death of Dr. Twiss, and no such contract has been produced. Hence we need give it no further consideration.

Decree is reversed. The complainant may take a decree in this court for an accounting, his share to be one-sixth of the commissions received from the Indians who were parties to the first two contracts made by Twiss and defendant, discharged from any obligation to contribute further than Twiss has already done to the expense of collecting said claims, with costs of this court. The cause will be remanded for the accounting and final decree in conformity with our decree. Costs of the circuit court to be determined on the final decree.

GRANT, C. J., and BLAIR, MONTGOMERY, and OSTRANDER, JJ., concurred.