HARRISON HEWITT, ADMINISTRATOR, C. T. A., *vs.* GEORGE E. SANBORN ET ALS.

Third Judicial District, New Haven, June Term, 1925.

WHEELER, C. J., BEACH, CURTIS, KEELER and MALTBIE, Js.

Findings of fact, made upon conflicting evidence, cannot be corrected upon appeal.

That certain facts "are supported by evidence and are material to the presentation" of the questions of law raised by an appeal, is

Hewitt v. Sanborn.

not, under the statutes and rules relating to the procedure in this court, a permissible ground upon which to ask for additions to a finding.

It is a well-established rule that the general assets of an estate are subject to the payment of post-mortem claims arising out of the operation of a testator's business by his executor, only when the terms of his will or of an ante-mortem agreement indicate, either expressly or by fair implication, that such was his intention; otherwise, such charges are payable only out of the specific assets immediately connected with or involved in the conduct of the business, and, if these be insufficient, the sole recourse of the business creditors is to the individual liability of the personal representatives.

In the present case, the testator specifically devised a farm to his daughter, and then left the entire residue of his estate in trust to his executors, directing them to organize a corporation for the continuation of his business, to transfer all his property, except the farm, to it, and to pay from the proceeds of its operation certain annuities which were to continue until the death of the last survivor of his sons. The executors carried on the business, but so unsuccessfully that, at the expiration of twenty years, the assets of the estate, apart from the farm, were insufficient to meet the charges which had accrued from the conduct of the business. *Held* that the daughter's farm could not be subjected to the payment of these business debts; and that the provisions of the will limiting and defining the property to be used in the business and excepting the farm therefrom, so far from indicating a contrary intent, reënforced the general rule in this particular.

The plaintiff claimed and the trial court concluded that the daughter's acquiescence in the continuation of the business, taken in connection with her interest therein as an annuitant under the trust, estopped her to deny that the farm was answerable for the debts in question. *Held* that the trial court erred, since no estoppel could arise against the daughter in the absence of conduct on her part actively tending to induce the executors, otherwise unwilling, to carry on the business.

Under the common law, as modified by § 4944 of the General Statutes, the funds from which ante-mortem claims against an estate and the expenses of administration are payable, are, unless the will contains a contrary direction: first, the personal estate not specifically bequeathed; second, the real estate not specifically described and devised; third, specific legacies; and fourth, specific devises.

In the absence of neglect or laches on the part of an ante-mortem creditor, his lien upon the real estate of a deceased person persists as long as testate or intestate administration may be granted (which now, under § 4978, may in some instances exceed

Hewitt v. Sanborn.

the period of ten years after the death of the decedent); but the uncertainty in land titles resulting from this principle has been modified to some extent by § 5017, which provides that, except during the ten-year period, no order for the sale of a decedent's real estate shall be made where it has been sold or mortgaged in good faith and for value by the heirs or devisees.

The title of a specific devisee, and his right to possession, flow directly from the will and vest immediately upon the death of the testator and are not held in suspension during the settlement of the estate.

Neither an order of distribution by the Court of Probate, nor a certificate of devise, add to the validity of the title of a specific devisee; they merely serve as convenient guides or pointers to an examiner of the records.

The plaintiff, as successor to the original executors, claimed that not only the defendants, who had succeeded to the interest of the daughter, now deceased, but the unpaid creditors, had lost their rights to the farm by laches. *Held* that the plaintiff was in no position to make this claim on behalf of the estate, since the neglect of its representatives to effect a reasonably speedy settlement, and their failure to carry out the provisions of the will with respect to the incorporation of the business and the establishment of the trust, had exposed them to the full application of the maxim, *in pari delicto, potior est conditio defendentis;* and that, moreover, the right of the creditors could not be adjudicated in this action, to which they were not parties.

The defendants contended that, because the daughter had originally taken possession of the farm before the testator's death, by virtue of his statement to her that "you shall have it" and his instructions to his son not to interfere with her occupancy, she had, by a continuous holding until her death, acquired title by adverse possession. *Held* that there was no merit to this contention.

The defendants made various claims for relief by cross-complaint, which involved, among other things, the quieting of their title to the farm. *Held* that the relief must be denied, since it was extremely doubtful whether, in the absence of other parties, a binding and conclusive judgment could be granted; and that the plaintiff's double position, as successor to the testator's executors and as administrator of the deceased daughter's estate, viewed from the standpoint of his duty to protect the interests of the creditors and beneficiaries of both estates, involved at least a formal antagonism rendering inadvisable an adjudication of the questions presented.

Argued June 5th—decided September 19th, 1925.

Hewitt v. Sanborn.

SUIT for an injunction and other equitable relief, brought to the Superior Court in New Haven County and tried to the court, *Brown, J.;* judgment rendered for plaintiff upon the complaint and upon the defendants' cross-complaint, from which the defendants appealed. *Error and judgment reversed.*

The plaintiff is administrator, with the will of the testator to his administration annexed, upon the estate of John Beattie, late of Guilford, deceased, and brings this action against George E. Sanborn *et als.,* including himself as administrator upon the estate of Isabel Sanborn, late of Guilford, claiming that her heirs-at-law now in the occupation of certain real property in Guilford, which formerly belonged to Beattie, had cut down and carried away certain trees on this property and threatened to continue so to do, thereby wasting and destroying the estate, and that outside of this property there were not sufficient assets to pay the claims against Beattie's estate, and praying for an injunction to restrain further waste. The answer of the defendants sets up facts averring the devise of the land to Isabel Sanborn, her continued possession and that of her children and heirs-at-law, which latter claim title to the property both by devise and adverse possession, and claiming that the plaintiff was not entitled to an injunction, and cross-complaint claiming that defendants were entitled to certain relief in the way of quieting title, and a declaratory judgment as to the same.

John Beattie died in Guilford, leaving a will dated April 20th, 1899, which was admitted to probate on December 12th, 1899. His sons Peter Beattie and John Beattie, Jr. were named executors in the will, and qualified and served as such until their resignation in 1919, when the plaintiff was appointed administrator as before stated, and is now serving as such.

In his will the testator directs the payment of his debts, makes certain bequests of personalty to his wife, and then proceeds as printed in the footnote.

"Third: I give, devise, and bequeath to my daughter, Isabel Sanborn, so much of the farm, with the buildings thereon, which I purchased from William Wilcox, and which lies north of the public highway, which leads from the Leete's Island station, to the house of Calvin M. Leete, so much of said farm and buildings to be hers in fee simple.

"Fourth: I give, devise and bequeath all of my estate, whether real, personal or mixed, and wherever the same may be situated, to my sons, Peter Beattie and John Beattie, Jr., to be held by them in trust for the purpose hereinafter set forth, and with the powers hereinafter mentioned and provided.

"(1) I authorize said trustees, and I direct them, at their discretion, to sell and make good conveyance of any of my estate, whether real, personal or mixed, except the developed quarry property at Leete's Island, of which I am the sole owner; and I also authorize said trustees to convey any of my real estate, including any or all of my quarry property to, and to invest any of my personal estate in, a joint stock company which they may form or cause to be formed under the laws of the State of Connecticut, for the purposes of carrying on the business of quarrying stone, dressing, preparing, selling and transporting stone, for any purpose for which stone may be used in the ordinary course of the business of constructing by contract or otherwise, public or private works of any description, in which the use of stone from said quarry shall be a part of the material employed and used, and for the purpose of quarrying, preparing and selling stone from any quarries belonging to said joint stock company; provided, however, that said trustees shall always keep and hold at least three-fourths of the stock of such corporation in their names as trustees, such stock to be a part of the trust estate created by this will.

"(2) Said trustees are hereby authorized and fully empowered to form and organize a joint stock company under the laws of the State of Connecticut, and they may transfer to such company the whole or any part of the trust estate in their hands, subject, however, to the proviso at all times at least three-fourths of the stock of such company shall be held by said trustees, as trustees, for the purposes named in this will.

"(3) Said trustees are to pay from the net income of the trust estate in their hands, any annuities, charges or obligations which I may be under by reason of any contract or obligation I have entered into, and they may, at their discretion, set apart any part

The trial court finds that the testator died possessed of over three hundred and twenty-five acres

of the trust estate in their hands as a special fund, charged with the payment of such annuities, charges or obligations.

"(4) After the payment of any charges or obligations as the same are set forth in the foregoing clause of this will, said trustees are directed to pay from the net income of the trust estate the sum of $1,200 annually, during the continuance of her life, to my wife, Mary G. Beattie, such payment to be made in quarterly payments of $300 each.

"(5) After the payment of the annuity to my said wife, I direct my said trustees to pay from the remainder of the net income in their hands, the sum of $400 annually to my daughter, Isabel Sanborn, in quarterly payments of $100 each, such payments to be made during the life of my said daughter."

Testator next directs the payment of $1,000 each by his trustees out of the net income or principal of the trust estate to each of the children of his deceased son George, when they severally become twenty-one years old. Also he directs payment of the net income of the trust estate to his sons, Peter, John, Frank, David and Thomas, during the continuance of the trust, with provision for payment to the representatives of any son dying during its continuance. He further directs his trustees to employ his sons in the quarry business "if they continue to be sober and industrious," and then proceeds as follows:

"(9) Until my said trustees shall find it expedient and proper to organize a joint stock company under the authority given them in this will, I authorize them to use any or all of the trust estate herein devised to them, for the purpose of carrying on the quarry business, and the business of preparing, selling and transporting stone as it is now carried on by me at Leete's Island.

"(10) Neither my said trustees nor executors shall have the power to put any mortgage or any other incumbrance upon the real estate herein devised.

"(11) When the last survivor of my said sons Peter, John, Jr., Frank, David and Thomas, shall die, the trust herein created shall terminate, and all of the estate belonging to the said trust shall be divided among the male heirs of the bodies of my said sons who may be then living, in equal portions, per capita; and if there shall be no male heirs of the bodies of my said sons then living, then said trust estate shall be distributed among the heirs at law of my said sons according to the provisions of the Statutes of Connecticut."

On November 17th, 1899, the testator executed a codicil to his will providing as follows:

of real property at Leete's Island, including four tracts aggregating in area about fifty-four acres, which latter make up the land devised as above set forth in the will to Isabel Sanborn, and which will hereinafter be designated as the Sanborn farm. The inventory of the estate included about three hundred and twenty-five acres of land at Leete's Island, with buildings thereon valued at $13,421, and personal estate of boats, derricks, quarry implements, etc., valued at $50,976.61, and also choses in action, consisting of actions pending in court, to a considerable amount. The list of claims against the estate filed in the Court of Probate aggregated $35,036.86. At the time of John Beattie's death and for several years thereafter, the personal property not specifically bequeathed and the real property not specifically devised in his will, which belonged to his estate, was more than sufficient to pay in full all ante-mortem claims against his estate, as well as the expenses of administration thereof, exclusive of expenses incurred by the executors in carrying on the quarry business.

The executors continued to carry on the business of their deceased father until 1919. They from time to time filed in the Court of Probate detailed accounts of their doings as executors, including, among other things, the names of creditors and the amount of indebtedness contracted. All such accounts, after due notice and hearing by the Court of Probate, were allowed, approved and accepted. In December, 1909, two heirs of John Beattie, other than defendants San-

---

"I hereby direct that no part of my estate, either real or personal, be disposed of for a period of three years after my decease, except that my executors may sell building lots at their discretion.

"And the proceeds of my property sold after my decease shall be added to my estate as a part of the capital or fund for business transactions."

born or their mother, appealed from the order and decree of the Court of Probate accepting the executors' accounts, and the appeal was fully heard and determined by the Superior Court, and the account was accepted and the action of the Court of Probate was confirmed, although no order of the Court of Probate expressly authorizing the executors to carry on the business was ever passed.

There was unusual difficulty incident to administering this estate, due to the character of the assets, the amount of litigation which the executors inherited as well as the limitation placed by the testator upon the executors, providing that they should not dispose of any real estate for three years, and there was no unreasonable delay in its settlement in view of these conditions. It was in an effort reasonably conceived at the time to be for the best interest of the estate and in the hope of ultimately preserving it from loss, that the executors in good faith carried on the business of the estate and operated the quarries of the testator, although in fact substantial debts were so contracted and losses to the assets of the estate resulted. Included in the disbursements of the executors was an item of $3,250 paid in settlement of a contest concerning the will. As to the claims presented against the estate which may affect it, the procedure incidental to the final determination thereof has never been had, and none of the debts created by the executors have been established in any proceeding and some of them never have been disallowed. The question as to the priority between the several classes of creditors has never been presented to the Court of Probate and no order for the distribution of the funds has ever been requested or passed. The estate is now insolvent and there are at least three different kinds or classes of claims unpaid: (1) Un-

paid ante-mortem claims aggregating $1,500, plus interest. (2) Claims contracted after the testator's death by the two executors in carrying on the quarry business formerly conducted by him and in administering the estate, aggregating from $50,000 to $60,000. (3) The claims for services and expenses incidental to the plaintiff's administration, which are substantial but undetermined. From the time of John Beattie's death to the present time, ante-mortem creditors who presented claims against the estate have taken no steps to collect their claims except the presentation of them to the executors. There is property in the hands of the plaintiff as administrator *c.t.a.* exclusive of the land occupied by the defendants, consisting of personal property of about $19,000 value, and real estate worth about $20,000. This property exceeds in value the total of the unpaid ante-mortem claims presented against the testator's estate and contracted in his lifetime. In addition to the personal property inventoried and appraised in the estate of John Beattie, the executors recovered substantial amounts upon unliquidated choses in action, including recovery of about $13,500 in one of them by a lawsuit. The expenses of administration incurred since the plaintiff was appointed have not been determined, although they have been of a substantial character. Isabel Sanborn as devisee of the land involved in this case, never moved to obtain the passage of any decree concerning the settlement of this estate which would have made her title secure, and made no objection to the continuance of the business by the executors, and no distribution of the estate has been made. She had knowledge that the business was conducted by them, and took no appeal from the orders and decrees of the Court of Probate for the district of Guilford accepting, approving and allowing the several accounts of the

executors.   She survived her father until February
16th, 1916, when she died intestate.

For several years prior thereto and at the time of
John Beattie's death, Isabel Sanborn, with her hus-
band and several children, was occupying the four
pieces of real property hereinabove referred to.   This
occupancy was solely with the permission of John
Beattie, her father.   Isabel Sanborn, with her family,
occupied the premises until her death, and since then
her children and only heirs have continued to occupy
them.

All taxes on the acreage occupied by Isabel Sanborn
and the defendants were at all times paid by the es-
tate of John Beattie, and the acreage was at all times
included in the rateable estate of the estate of John
Beattie in the town of Guilford. Neither Isabel San-
born nor any of the defendants ever filed any list for
taxation purposes including these premises.   The oc-
cupancy of the premises after the death of John
Beattie was with the permission of the executors and
in expectation and hope by Isabel Sanborn and, after
her death in 1916, by the defendants other than
Hewitt, administrator, that the estate of John Beattie
would be settled and the property devised to Isabel
Sanborn would be set out to them.   Isabel Sanborn
during her lifetime frequently feared that she would
not ultimately receive the real estate devised to her
under her father's will, because the estate was not
being settled promptly by her brothers, and she feared
that it would be taken for payment of the claims of
creditors of the estate.   In the construction of a dock
upon the property not specifically devised to Isabel
Sanborn and for use in the quarry business, timber was
cut upon and taken from the fifty-four acres devised
to Isabel Sanborn.   After the death of Isabel Sanborn,
the defendants other than Hewitt, administrator,

continued in possession of this land without objection on the part of the executors.

The sons of Isabel Sanborn, while it was occupied by her and them and also after her death, cleared up the land from time to time, built and repaired fences, farmed the land, kept cows and sold the milk on a milk route. Defendant George Sanborn has put hunters and apple thieves off the land. Defendants other than Hewitt, before the filing of the answer in this action, never claimed adverse possession, but occupied the premises in the expectation that upon settlement of the estate they would become the owners of the Sanborn farm absolutely. Isabel Sanborn expected to receive the farm when the estate was settled, and never made claim to it in any other way. The executors never qualified as trustees nor carried on business as such; never formed a corporation, and never paid anything to beneficiaries as directed in the will. The defendants, other than Hewitt, and their mother while living, cut down trees for firewood for family use. Shortly before the bringing of this action these defendants had cut large quantities of cordwood and sold it, and have threatened to continue so to do. During the occupancy of the premises by Isabel Sanborn and her children, they repaired the roof sufficiently to keep out the weather, rebuilt one or two outbuildings that were falling down, and built chicken coops. Repairs were only made when necessary for the comfortable occupancy of the premises. The occupancy of the defendants, other than Hewitt, and of their mother before them, was never adverse to the rights of creditors, but they all recognized the fact that it might be taken from them to pay creditors. Neither Isabel Sanborn nor any of the defendants ever paid rent for the use and occupation of the premises. The annuity given Isabel Sanborn in the will, of $400,

was never paid to her, or anything on account thereof. Defendants other than Hewitt were on friendly terms with their relatives and in familiar relations. They were familiar with the activities of the executors regarding the estate, and some of them were employed in the quarry business, but had no part in its management. Through the acquaintance of her sons with the conduct of this business and by her own observations, Isabel Sanborn had full knowledge of the continuance of business by the executors, and expected that from the profits therefrom her annuity would be paid.

Further facts appear in the opinion.

Upon his pleadings and the facts as above set forth, plaintiff sought the injunction above referred to, and received judgment for the same. Upon their cross-complaint defendants claimed relief as follows: "(1) A judgment determining the rights of the parties to said land described in the third clause of John Beattie's said will and in the seventh paragraph of this answer. (2) A judgment determining the question in dispute between the parties and quieting and settling the defendants' title to said land. (3) A judgment which shall decree that the property of John Beattie's estate now in the hands of the plaintiff Hewitt, administrator, shall be used to pay the unpaid claims against his estate, and that the said land and its proceeds, and the defendants as the owners thereof, be exonerated from such payment. (4) A judgment which shall decree that said land and the proceeds thereof are not liable to be used or taken for unpaid claims allowed against John Beattie's estate. (5) A judgment which shall decree that said land and the proceeds thereof are not liable to be used or taken to pay debts so contracted since the death of John Beattie. (6) A decree directing plaintiff, Hewitt, to

take proceedings to obtain in the proper court an order of distribution of the real property mentioned in the third clause of said will, to these defendants. (7) Other equitable relief. (8) A declaratory judgment decreeing: (a) That the defendants are the owners in fee simple of the said land, free from any obligation with respect to John Beattie's estate. (b) That the plaintiff, Hewitt, as such administrator with the will annexed of John Beattie's estate, and the creditors of John Beattie's estate having claims contracted either before or since his death, and his heirs, next of kin, and devisees other than Isabel Sanborn and the defendants as her heirs, have no claim, right, title or interest in or to said land or any part thereof."

Upon the complaint, answer and cross-complaint and the facts in the case, defendants made various claims of law, which will be referred to and considered in the opinion, as will also their appeal from the denial by the trial court of their motion to correct the finding.

*Frederick H. Wiggin,* for the appellants (defendants).

*Charles J. Martin,* for the appellee (plaintiff).

KEELER, J. The defendants' counsel specify ninety-six reasons of appeal from the judgment of the court, of which fifty-four relate to errors of law apparent in the finding, and forty-two are concerned with errors relating to the correction of the finding. Corrections in accordance with the errors assigned would result in a finding almost diametrically opposed upon certain issues, and render the holdings of the court utterly at variance with those called for by the finding if corrected. The requested additions to the finding not made by the trial judge are either based on conflicting

evidence or are conclusions from other and subordinate facts already appearing one way or the other in the finding, and the requested excisions do not embrace paragraphs found without any evidence. The claim to add facts to the finding because they "are supported by evidence and are material to the presentation" of questions of law on appeal, is of course in characteristic disregard of the statutes and rules relating to the matter in hand, as emphasized by recent and iterated statements by this court which need not be cited. Only corrections alleged to arise from uncontradicted and undisputed facts can be considered. However, upon the facts found by the trial court as they stand in the record, a full consideration of all of the points made by appellants may be had.

The numerous claims of error made in the appeal record are summed up by defendants' counsel in his brief in four different broad claims of law, within which he very properly says the errors assigned may be included. These are as follows:  (1) "The Sanborn farm was a general asset of the testator's estate not connected with his quarry business, and as such is not subject to business debts, contracted by the executors in running the business. (2) Creditors whose claims accrued before the testator's death and whose claims were proved and allowed against his estate have no standing to enforce such claims, amounting to about $1,500, against the Sanborn farm." (3) The defendants have gained title to the Sanborn farm by adverse possession. (4) The defendants are entitled to a judgment as prayed for in the cross-complaint and judgment in their favor on the complaint.

Taking up the first point just above quoted, we observe that upon this point the defendants' brief is occupied largely with a general discussion concerning

the amount and character of the assets of the estate of a deceased person which may be used in carrying on a business in which deceased was engaged while in life, where his will provides for the continuance of such business by his executors, or the testator by his articles of partnership with other persons, or by some special contract, has so provided. Defendants contend in the discussions and citations of their brief that they have established the general rule, that unless a will or an ante-mortem contract, expressly or by reasonable implication, clearly indicates that a testator intended that assets not connected with the business in any given case during his lifetime should be subject to business claims arising after his death, such assets are not legally applicable to the payment of such business claims. Our own cases seem to sustain this view. The first and leading case is *Pitkin* v. *Pitkin,* 7 Conn. 307, in which partnership creditors of a business carried on by executors claimed the right to stand as general creditors of the deceased's estate. The court in its opinion says, at page 313: "In respect of the creditors of the partnership, they are divisible into two classes; those who were such before the testator's death, and those who became such afterwards. With respect to the first class of creditors, they have the power and means of calling forth after the testator's death, the whole of his property, in discharge of their demands; and this is all the security they can wish. And in regard to those comprising the second class, who become creditors subsequent to the testator's death, in the first place, they may determine whether they will be creditors. In the next place, they have the whole fund embarked in trade to look to. Superadded to this, they have the personal responsibility of the individual [the executor] with whom they deal, the only security in ordinary transactions of debtor

and creditor. It is, therefore, manifestly less inconvenient, to say, that those who deal with the executor, must take notice, that the testator's responsibility is limited by the authority given to the executor, than to assert, as the executor is authorized to carry on the trade, that all the other objects of the will must, at any distance of time, stand still, or that eventually they may be subjected to the claims of the partnership creditors. On these principles, it was concluded by Lord Eldon, that it would be unjust to consider the creditors of the company as having a lien on the testator's general assets; and as a precedent extremely inconvenient to the interests of mankind."

The same doctrine is recognized in *Alsop* v. *Mather*, 8 Conn. 584. In *Blodgett* v. *American National Bank*, 49 Conn. 9, the whole of testator's estate was subjected to payment of partnership debts of a concern in which decedent was a partner while in life, but solely on the ground of his liability under the articles of copartnership; the doctrine of *Pitkin* v. *Pitkin, supra*, is affirmed, but the case is distinguished by reason of decedent's liability before death, and his express extension of that liability after death in connection with his estate. Sustaining their contention defendants cite the following cases: *Smith* v. *Ayer*, 101 U. S. 320; *Burwell* v. *Mandeville's Exr.*, 43 U. S. (2 How.) 560; *M'Neille* v. *Acton*, 4 DeG., M. & G. 744; *In re Johnson*, L. R. 15 Ch. Div. 548; *Ex parte Garland*, 10 Vesey Jr. 110; *Laible* v. *Ferry*, 32 N. J. Eq. 791, and *Delaware, L. & W. R. Co.* v. *Gilbert*, 44 Hun (N. Y. Sup. Ct.) 201, affirmed in 112 N. Y. 673, 20 N. E. 416, wherein this excellent statement of the rule occurs, at page 204: "The trade creditor who may deal with the executor, relative to the special business which he is authorized to continue, has as his security the personal liability of the executor and a lien upon

that part of the estate of the testator which he has directed to remain in the business. He has no other remedy for the enforcement of his debt." See also *Fridenburg* v. *Wilson*, 20 Fla. 359, and *Frey* v. *Eisenhardt*, 116 Mich. 160, 74 N. W. 501. Our examination of the subject shows other cases which might be added in support of the rule under discussion. This rule is undoubtedly the general law. We do not deem it necessary to go into an extended discussion of its application to the facts appearing upon the record in this regard, since the testator has made it so clear by the provisions of the will itself. After directing payment of his debts, he first makes provisions for his wife, and then gives the Sanborn farm to his daughter Isabel "to be hers in fee simple." He then gives in trust to his executors "all of his estate" (clearly meaning all of the residue) with power of sale except as to the quarry, and directs them to incorporate the quarry business and to convey to it any or all of his real and personal estate, including the quarry property, and to invest any of his personal estate therein. The executors are directed to pay any charges or obligations under which the testator lay at his death, and were given power to set aside estate to form a fund for the payment of such obligations. After the payment of these obligations, the first charge upon the income of the trust was an annuity of $1,200 to his wife for life, and after that an annuity of $400 to his daughter Isabel for her life. After the death of these persons the income, and eventually the principal, of all of this residuary trust fund goes to the sons of the testator and their representatives. The trust is to continue until the death of the last survivor of his sons. So careful is the testator to integrate this residuary trust fund, that in the codicil executed the day before his death he directs that none of the estate shall

be sold for three years after his decease (except building lots), and then emphasizes and repeats the general provisions of his will by directing that the proceeds of all sales of property shall be added to the capital fund for business transactions. He thus carefully defines and limits the property to be used in continuation of his business, as by the earlier provision for his daughter he definitely sets apart her share in giving her the Sanborn farm. Isabel Sanborn had no share in the business trust beyond the annuity of $400; the sons were provided for in the bequest of the remainder. Until it was deemed expedient to form a corporation, the trustees might use any or all of the trust estate in carrying on the quarry business. The very definite separation of this business trust fund in the will from the specific devise of realty to Isabel Sanborn, together with the general law upon the subject, make it abundantly clear that the Sanborn farm is not subject to business claims, unless other matters occurring since the death of the testator have had that effect.

This the plaintiff attempts to show by claiming an estoppel by conduct on the part of Isabel Sanborn, therein following a conclusion reached by the trial court as set forth in the memorandum of decision. This alleged estoppel arose, it is claimed, from the fact that she knew of the continuance of the business by the executors, and that she expected by this operation to realize from the profits of the business the $400 annuity provided for her in the will. Plaintiff cites to this contention, *Levi's Estate*, 224 Pa. St. 233, 73 Atl. 334. The case is not in point, since there does not appear that there was in that case any separate fund other than the general corpus of the estate in any way to be applied in carrying on the business; that the whole estate was so used; that the widow

actively participated in its operation, to the extent of furnishing funds therefor on her private credit, and that she received her living therefrom. This case furnishes no analogy to the instant case. Plaintiff also relies upon the expression in the memorandum of decision of the trial judge that "the executors may well have carried on the business as they did believing with reason that it was necessary for the best interests of the estate and to preserve it from loss." To make this conclusion of any value, it must appear that something said or done by Isabel Sanborn induced the executors to proceed with the conduct of the business, which otherwise they would not have done. Then again, this contention assumes that by the general law and notwithstanding the express separation of devises and legacies in the will of the testator, the Sanborn farm might in some way be subjected to a lien in favor of claims of business creditors. If the business had been successful, the most that Isabel Sanborn would have derived therefrom was the payment to her of the annuity provided in the will; she had no share in any profits of the enterprise beyond that. It certainly cannot be held that creditors relying upon the continued conduct of the business by the executors gained any equity against the individual property of Isabel Sanborn, because she did not step in and call a halt and force an accounting and liquidation of the estate. The fact that she, like them, waited, with hope deferred, for the dawning of a better day ensuing from the eventual turn of the corner, and profit from the business, certainly has no force to estop her from denying that her realty, not in any way involved in or subjected to the risks of the business, should thus become a security for their claims. The facts found, that Isabel Sanborn never paid rent for the property, and occupied it with the permission

of the executors, are irrelevant. She had no obligation to pay rent, and needed no permission for her occupation. That her land was listed for taxation with the other land of the estate by the executors, and the taxes thereon paid by them, of itself or in connection with the other facts incident to her occupancy, does not derogate from her ownership of a full fee simple. If the executors paid out money on her behalf, it can be recovered from her estate, if a full development of the facts in that regard justifies a recovery. This farm is not subject to appropriation and sale by the administrator to pay claims arising out of the conduct of the quarry business by the executors, and hence on that ground he has no legal claim for an injunction to restrain cutting of trees.

The second point of defendants, as above stated, is that ante-mortem creditors have no standing to enforce their claims against the Sanborn farm: first, because the farm was specifically devised; and second, because these creditors have been guilty of laches in not pressing for an earlier settlement of their respective claims.

The effect of the specific devise of the Sanborn farm was to vest in testator's daughter an absolute fee simple. If needed for the purposes of paying ante-mortem debts of deceased and expenses of administration, it could have been sold by order of the Court of Probate for that purpose after a proper hearing on the petition to sell and due and legal notice thereof, after all the rest of the estate had been appropriated for that purpose and found insufficient. This court said in *Duffield* v. *Pike*, 71 Conn. 521, 529, 42 Atl. 641: "Under our common law as modified by General Statutes, § 540 [now § 4944], the funds from which debts and charges are to be paid, if the will contains no direction to the contrary, are: first, the personal

estate not specifically bequeathed; second, the real estate 'not specifically described and devised'; third, specific legacies; and fourth, specific devises. *Brainerd* v. *Cowdrey,* 16 Conn. 1, 498." See also *Jackson* v. *Bevins,* 74 Conn. 96, 49 Atl. 899, and *Jacobs* v. *Button,* 79 Conn. 360, 65 Atl. 150. In *Griswold* v. *Bigelow,* 6 Conn. 258, the court held that the lien of a creditor for a claim against a deceased debtor's estate existed until satisfied, if necessary by the appropriation of all of the estate, even after settlement and distribution and a sale by distributees to an innocent purchaser for value, and was not to be defeated except by the neglect or laches of the creditor, evidenced by gross neglect or unreasonable delay. The case of *Ricard* v. *Williams,* 20 U. S. (7 Wheat.) 59, 116, a case originating in Connecticut and concerned with Connecticut law, decided by the Supreme Court of the United States holding to the same effect, is cited, commented on and approved in *Griswold* v. *Bigelow, supra.* Both Chief Justice Hosmer and Justice Story, in the two cases last cited, observed that a perpetual lien on the lands of deceased debtors ought not to be sanctioned since it would be a public inconvenience. This burden was practically obviated in almost all cases by the statutory provision existing since 1821, that no will should be proved except within ten years from the death of the testator, and no intestate administration granted after seven years from the death of any person. By the Public Acts of 1885, Chapter 110 (General Statutes, § 4978), this provision was modified so that administration—testate or intestate—might be granted after the expiration of ten years from the death of decedent after a petition, notice and hearing, by the Court of Probate.

This latter provision caused great uncertainty in land titles, and a remedy was provided by the Public

Acts of 1907, Chapter 28 (now General Statutes, § 5017), which provides that no Court of Probate shall order the sale of real estate of a deceased person, where the same has been, in good faith and for value, sold or mortgaged by the heirs or devisees of the deceased, except during the period of ten years from the death of the decedent. Where, however, no such sale or mortgage has been made, the lien of a creditor still exists, and the Court of Probate has power to order a sale for proper cause shown. The executor or administrator has no control of realty specifically devised, pending administration, as that is specifically excepted by General Statutes, § 5027, providing for custody of real estate generally by personal representatives during settlement. The title to the Sanborn farm vested in the devisee. "The devise being a specific one and of the character it was, there went with it the right to the immediate possession of the property. General Statutes, § 362 [now § 5027]; *Merwin* v. *Morris,* 71 Conn. 555, 573, 42 Atl. 855. The vesting of the plaintiff's title, together with the right of possession, was not in suspension during the settlement of the estate of the testator, nor delayed by the fact that the property might be wanted for the payment of debts, as it was not in fact." *Foote* v. *Brown,* 81 Conn. 218, 224, 225, 70 Atl. 699; *Beckwith* v. *Cowles,* 85 Conn. 567, 570, 83 Atl. 1113. While in possession under the devise, Isabel Sanborn, and her heirs-at-law after her, had a right to sell the property, and could give good title so far as the estate of John Beattie was concerned, subject only to the lien of creditors for his debts, and after ten years from his death could give title free from this lien. Meanwhile, she and her representatives were absolute owners, could exercise all the prerogatives of ownership, and were free from impeachment of waste.

This statement of the law is in effect conceded by plaintiff's counsel in brief and argument, but he contends in answer to the defendants' claim of laches on the part of the executors of the will and of the succeeding administrator, that even if there has been laches on the part of the latter, the defendants have been equally at fault in not forcing a settlement of the estate and perfecting the title to the Sanborn farm by a certificate of devise, and a distribution. Neither of these would have added to the validity of the title. A certificate of devise is not a muniment of title; it is merely a pointer to guide an examiner of the land records to an estate in probate through which title is derived, and the inclusion of this farm in a distribution would not strengthen the title thereto. As a convenience, lands specifically devised are often included in a distribution of all of the realty of an estate, but it is not an operative act of the Court of Probate; the title to the land flows from the will containing the devise. The court finds that Isabel Sanborn knew of the operation of the business and hoped that matters would so shape themselves that her property would come to her free of creditors' liens. The court finds that the executors inherited much litigation, were hampered by the provision in the will that land should not be sold until after three years from testator's death, and that there was no unreasonable delay in settlement in view of these provisions; also that, in the hope of ultimately preserving the estate from loss, the executors continued the quarry business in good faith, although in fact substantial losses occurred to the corpus of the estate. They very clearly did not carry out the directions of the will, to establish a trust from the assets remaining in the residuary estate, nor did they incorporate the business as directed. They obtained no order to carry

on the business from the Court of Probate, as inci-
dental to the proper closing up of the estate. It was
certainly their duty to segregate the business fund
from the general assets of the estate, and from the
latter to liquidate the ante-mortem claims against it.
During twenty years the executors conducted a losing
business, hoping for a change which never came, and
dragged alongside of this business the general opera-
tion of settling the estate. This continued for twenty
years, a fact which, though taken in consideration with
certain other facts found by the court, can hardly
support a finding as an ultimate conclusion of provi-
dent administration. The administrator *c.t.a.* ap-
pointed to liquidate the estate has been occupied for
five years more, a length of time which does not, to
say the least, indicate unusual acceleration. This is
not an orderly and expeditious administration of an
estate. *Wheeler's Appeal,* 70 Conn. 511, 515, 40 Atl.
452. This is so especially in view of the finding of the
court that at the death of the testator and for several
years thereafter, real and personal property not
specifically bequeathed or devised formed part of his
estate to an amount exceeding the ante-mortem claims
against the estate and expenses of administration, ex-
cluding expenses of the quarry business.

Counsel for plaintiff not only allege laches on the
part of defendants, but also on the part of unpaid
creditors, as to whom it may be observed the executors
and the administrator owed duties, as well as to the
beneficiaries. The trial court instances the effect of
the maxim *in pari delicto,* and suggests that the credi-
tors showed as much or more lack of diligence as did
the executors and administrator; if so, it would seem
that the full application of the maxim, adding thereto
its latter part, *"potior est conditio defendentis,"* might
come into play and result in refusing aid to plaintiff

by the issuance of an injunction. We are not in a position to pass upon this contention of defendants with finality, owing to the lack of proper parties, creditors, whose laches certainly ought not to be and cannot be determined in an action where they are not parties, and where the very persons, i.e., executors and an administrator, who are supposed to represent their interest, are actively pursuing the claim of laches against them. We can only say that, as far as the relief by injunction is concerned, the claim of the defendants upon the question of laches has sufficient validity and merit, so as to prevail against the issuance of the injunction prayed for, restraining them from the exercise of an ordinary prerogative of absolute ownership.

The third contention of defendants is that they (excepting the administrator) have title to the Sanborn farm, and that Isabel Sanborn had title thereto by adverse possession. In that case the initial adverse possession must have begun prior to the death of the testator, since there is no question but that the will gives her absolute title. The claim of defendants is that she went into possession by an oral gift from her father, void by reason of not complying with the statute of frauds by being in writing, and that by the character of her subsequent possession she acquired title against him and his heirs. The facts found by the trial court in this regard are briefly these: Isabel Sanborn, by her father's direction and permission, began to occupy the premises in 1888. John Beattie before his death said to his daughter, "Belle, that's your place and you shall have it;" John Beattie once said to his son John "that these premises were Isabel's without let or hindrance, and her possession of them should not be interfered with;" that before the testator died, and a short time before Isabel occupied the

premises, her father told her to go and live on the land; that she did so, occupied them at the time of his death, and continued so to occupy them until her death in 1916; that during all of this period she occupied the farm in complete possession, and made use of it as she chose, as a farm and as a homestead. Further details will be found in the statement of facts. There is nothing in the record to establish an adverse possession by her as against her father. He evidently followed the not unusual practice of a large owner of land of setting apart a portion of his property for the exclusive use of one of his family, and incidentally telling other members of the family not to molest that possession. She went ahead and used the property in the way it would ordinarily be used, and there is nothing in her use to initiate a holding adverse to her father during his lifetime. All that he said and did, and all that she did, would indicate only a license and permission to occupy during his pleasure. When this is coupled with the devise in his will of this very property, from which the inference is very strong that he still claimed to own the property, nothing can be found in the record justifying a finding of the court of title by adverse possession. So far as her occupancy of the premises after his death is concerned, she (and her heirs afterward) did just what any absolute owner of real property would do, lived on the place, made necessary repairs, enjoyed its use, and took the income from farming operations. These acts did not evidence any claim adverse to that of creditors, nor that Isabel Sanborn and her heirs were claiming except under the will, nor could anything that she or they might do in and about the land have that effect. She was the owner in fee, she could do as she chose with the property. She knew that as a possible eventuality her property might be taken to

pay debts, and was evidently greatly concerned by this fact, but all that she could do was to act like any owner, and hold on until some effort was made by proper proceedings to appropriate the farm. The trial court correctly held that Isabel Sanborn took title under the will and not by adverse possession.

Flowing from the pleadings and facts in the case, are other claims made by the parties. In the complaint, after asking for an injunction, the plaintiff makes the further claim for relief for "judgment quieting title," etc. This claim is not so worded as to the methods and extent of the relief asked, as to form a basis for relief. The defendants, however, make the claims above set forth in full in the statement of facts. We do not feel that there is such a representation of parties as would justify us in passing upon the claims of the cross-complaint, either by way of quieting title or by rendering a declaratory judgment. It is urged that the parties to the present action, either in person or as represented by the administrator of the two estates, include all necessary for granting the relief asked. The representation of the administrator is two-fold. As has been frequently and properly held, he is a fiduciary of the creditors, but it is equally true that he represents the interests of the beneficiaries.

In the present case, the same person is administrator of the estate of John Beattie and of that of Isabel Sanborn. In the former capacity it is his duty to recover all possible assets of the estate and to apply the same to the payment of creditors and the expenses of settlement, that is, to enlarge the assets of the estate as far as he legally may. On the other hand, it is equally his duty to see that the estate of Isabel Sanborn suffers no unlawful diminution or depletion. In this situation his duties toward each estate are at least in formal antagonism, and may become actually

so. This is not to say that his position is in any way illegal or unethical, but it illustrates the difficulty of holding that he can so represent the creditors and ultimate beneficiaries in both estates in such a degree as to dispense with the presence in the action personally of creditors and certain beneficiaries not now made parties. It is extremely doubtful whether we could render a binding decision upon any of the claims for relief made in the cross-complaint, certainly not as to some of them which would be effective and conclusive. *Braman* v. *Babcock*, 98 Conn. 549, 559, 120 Atl. 150. In *Joy Co., Inc.* v. *New Amsterdam Casualty Co.*, 98 Conn. 794, 120 Atl. 684, there was a full representation of the necessary parties, as respects the relief therein granted. We have therefore considered only the issues raised by the complaint and answer so far as a decision of the same is necessarily involved in the prayer for an injunction. Most of the questions involved in the claims of defendants will arise in the final settlement of the Beattie estate in the Court of Probate, especially the pecuniary result of the same, and the determination of certain priorities, which have not been brought into discussion in the present case. The estate is hopelessly insolvent. If it has not been so represented to the Court of Probate, that should be done and a speedy settlement secured. The simple, flexible and comprehensive procedure in that court, especially as regards notice, provides an expeditious and adequate means of a final ascertainment and solution of the claims of all legally concerned, with the rights of appeal to the Superior Court if deemed necessary. No adjudication which we can make upon the pleadings and facts found in the instant case can cover and settle in advance all the questions likely to arise in the final settlement of the estate. Our holdings as to the appropriation of the Sanborn farm for debts incurred

in the quarry business, and the nature of Isabel Sanborn's estate in the farm, will furnish some guidance in the matter. The trial court did not err in refusing relief upon the cross-complaint.

There is error, the judgment is reversed, and the Superior Court is directed to render judgment for the defendants upon the complaint and for the plaintiff upon the cross-complaint.

In this opinion the other judges concurred.